## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SEAN CURRAN, DELAWARE ADAPT,
FREEDOM CENTER FOR INDEPENDENT
LIVING, UNITED SPINAL ASSOCIATION,
NATIONAL COUNCIL ON INDEPENDENT
LIVING, NOT DEAD YET, and INSTITUTE
FOR PATIENTS' RIGHTS,

        *Plaintiffs*,

      v.

THE HONORABLE MATTHEW MEYER, in
his official capacity as Governor of the State
of Delaware, DELAWARE DEPARTMENT
OF HEALTH AND SOCIAL SERVICES,
THE HONORABLE CHRISTEN LINKE
YOUNG, in her official capacity as Secretary
of Delaware Department of Health and Social
Services, DELAWARE BOARD OF
MEDICAL LICENSURE AND DISCIPLINE,
JOSEPH PARISE, D.O. in his official capacity
as President of the Delaware Board of Medical
Licensure and Discipline, DELAWARE
BOARD OF NURSING, and JACQUELINE
MAINWARING, CRNA, APRN in her
official capacity as President of the Delaware
Board of Nursing,

        *Defendants*.

C.A. No. _____

## **COMPLAINT**

      Plaintiffs Sean Curran, Delaware ADAPT, Freedom Center for Independent Living, United

Spinal Association, National Council on Independent Living, Not Dead Yet, and Institute for

Patients' Rights (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this

action against the Honorable Matthew Meyer (in his official capacity as Governor of the State of

Delaware), the Delaware Department of Health and Social Services ("DHSS"), the Honorable

Christen Linke Young (in her official capacity as Secretary of DHSS), the Delaware Board of Medical Licensure and Discipline (the "Medical Board"), Joseph Parise, D.O. (in his official capacity as President of the Medical Board) the Delaware Board of Nursing (the "Nursing Board"), and Jacqueline Mainwaring, CRNA, APRN (in her official capacity as President of the Delaware Board of Nursing ) (collectively, "Defendants"),  averring as follows:

## NATURE OF ACTION

1.      Delaware's End of Life Options Act, 16 *Del. C.* § 2501C, *et seq.* ("EOLOA" or the "Act"), is scheduled to go into effect on January 1, 2026 (or as soon as final regulations are in place), and will allow providers, including Advanced Practice Registered Nurses ("APRN"), to prescribe drugs—not to alleviate pain or suffering—but to cause the death of the patient and intentionally facilitate suicide.

2.      Plaintiffs, people with life-threatening disabilities and organizations that represent and advocate for people with life-threatening disabilities, belong to a class of protected individuals who are at imminent risk of harm if the Act is allowed to go into effect.  To protect themselves from this fast-approaching threat, Plaintiffs bring this action to stop Defendants, government officials, from putting in place this deadly and discriminatory system.  The Act—if allowed to go into effect—will steer people with life-threatening disabilities away from necessary lifesaving and mental health care, medical care, and disability supports, and toward death by suicide under the guise of "mercy" and "dignity" in dying.

3.      Throughout the country, a state-endorsed narrative is rapidly spreading that threatens people with disabilities:  namely, that people with life-threatening disabilities should be directed to suicide help and not suicide prevention.  This world view is being touted as a common-sense objective:  people who have life-threatening disabilities should be able to readily obtain physician assisted suicide.  At its core, this is discrimination plain and simple. With cuts in

healthcare spending at the federal level, persons with life-threatening disabilities are now more vulnerable than ever.

4.     EOLOA's passage is clear and present danger to people with life-threatening disabilities in Delaware.  Persons who are identified as "terminal"—*i.e.*, people with life-threatening disabilities—are able to obtain assisted suicide.  The new law does not require any evaluation, screening, or treatment by a mental health professional for serious mental illness, depression, or treatable suicidality, all of which could are necessary for informed consent and a truly autonomous choice, before the lethal prescription is written.  The provider need not have expertise with the patient's specific illness or condition and need not be trained on mental health symptoms or side effects associated with the patient's illness or treatment.  While the provider is supposed to discuss "feasible" alternatives to suicide, including available treatment options and the foreseeable risks and benefits of each, the provider is not required to do anything to help the patient obtain access to these frequently difficult to obtain services, nor are insurers required to cover them.

5.     Assisted suicide under EOLOA violates federal disability rights laws and the U.S. Constitution's Equal Protection clause which protect people with disabilities from discrimination, exclusion, and life-threatening state action.  Under federal law, a public entity may not withhold services or make services available on unequal terms based on disability.  EOLOA, however, does just that.  EOLOA is offered to people with life-threatening disabilities.  Not only is this facially discriminatory, it also places persons with disabilities in a much more vulnerable position.

6.     The Delaware government agencies and officials named in this action fund, oversee, and operate public health, social services, and medical profession regulations to provide protective services for people who express suicidality, and to prevent medical professionals,

caregivers, and family members from taking advantage of, or encouraging, a person's impulse for self-harm or suicide. Delaware is heavily dependent on federal funding for its medical services. With changes in federal funding and the increasing costs of health care, EOLOA poses a grave risk of harm to all persons who rely on the support of public health and social services, as well as on the objectivity and integrity of the medical and nursing professions.

7.      EOLOA has changed the dialogue: the default protective network of service—offering suicide prevention—has been withdrawn from Plaintiffs and their constituent members solely based on a provider's prediction that they will die within six months. This will create a two-tiered medical system in which people who are suicidal receive radically different treatment responses by their providers and protections from the state government depending on whether the patient has what the provider deems to be a "terminal disease," *i.e.*, based on disability.

8.      EOLOA discriminates against people with life-threatening disabilities by arbitrarily depriving them of protections afforded to others in violation of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and Section 1557 of the Affordable Care Act ("ACA"). The Plaintiff organizations represent members who have disabilities within the meaning of the ADA, Section 504, and the ACA and as such are protected by those statutes. The state government funds and provides mental health care, supportive services, and other suicide prevention measures to non-disabled people who express a wish to die, but the Act, by default, will channel and steer persons with disabilities, including people with eating disorders, spinal cord injuries, and other life-threatening or terminal disabilities toward assisted suicide instead.

9.      EOLOA does not reasonably advance its claimed purposes of enabling autonomous choices in dying and relieving suffering and violates the Equal Protection Clause of the Fourteenth

Amendment by treating people with life-threatening disabilities differently as compared to everyone else who expresses a wish to die to their medical provider.  There is no rational basis for EOLOA's "terminal" classification given that medical professionals often misdiagnose some patients as having terminal diseases, physicians' prognoses of six months to live are often fallible, and the "terminal" classification includes people who can live a longer life span with treatment and supports, including individuals who have eating disorders, spinal cord injuries, and other disabilities, such as diabetes, that are treatable.  EOLOA's very purpose and core requirement—providing an early death to someone who will die from a terminal illness within six months—is irrational, unreliable, and discriminatory, in violation of both the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment.

10.    EOLOA also violates the Due Process Clause of the Fourteenth Amendment and Article I, Section 7 of the Delaware State Constitution because it lacks the safeguards needed to protect people with life-threatening disabilities from self-inflicted death caused by impaired judgment, depression, and undue influence by others.  Despite established medical knowledge that those with life-threatening disabilities are at greater risk of depression and suicidal ideation, there is no requirement for a mental health evaluation or any oversight to ensure that judgment is not impaired at the time of ingestion.

11.    Plaintiffs ask the Court to declare EOLOA to be in violation of federal disability law and the U.S. and Delaware State Constitutions and to preliminarily and permanently enjoin Defendants from allowing the practice of assisted suicide under EOLOA to go into effect on January 1, 2026.

## JURISDICTION AND VENUE

12.    An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a).

13. This Court has jurisdiction over Plaintiffs' claims arising under the United States Constitution and 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

14. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' claims under Art. I, § 7 of the Delaware State Constitution of 1897 (as amended) (the "Delaware State Constitution"), which is so related to Plaintiffs' claim under the 14th Amendment that they form part of the same case or controversy under Art. III of the U.S. Constitution.

15. This Court has jurisdiction over Plaintiffs' claims arising under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Section 1557 of the Affordable Care Act, and the regulations promulgated thereunder, pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

16. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, by 42 U.S.C. §§ 12101 *et seq.*, 29 U.S.C. § 794 and by the general legal and equitable powers of this Court.

17. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) because at least one of the Plaintiffs resides in this district, one or more of the Defendants reside in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## THE PARTIES

**A. Plaintiffs.**

18. **Plaintiff Sean Curran** is a citizen and resident of the State of Delaware. Mr. Curran suffered a severe spinal cord injury 36 years ago as a teenager which has left him as a quadriplegic. Mr. Curran requires nursing assistance for his daily routines including eating, drinking, and personal hygiene, and Mr. Curran uses a wheelchair for mobility.

19. Despite his disability, Mr. Curran has lived a full life, graduating from the University of Delaware in 1997 with a Bachelor of Science in Business Administration focusing

on finance and marketing. Thereafter, Mr. Curran received an MBA from the University of Delaware in 2001 with a focus in finance. Mr. Curran has worked for 27 years at J.P. Morgan Chase in Newark, becoming a Private Bank Service Manager Vice President in J.P. Morgan Private Bank.

20.    Mr. Curran is the father of two boys. In his spare time, Mr. Curran has served as an inspirational speaker, and has taught classes at his local church, including taekwondo and self-defense classes for adults and youth.

21.    Mr. Curran has deep concerns regarding the impact of the Act. As a person with a life-threatening disability, he would be labeled as having a "terminal illness" by virtue of the Act, and the option to seek assisted suicide would be made immediately available to him. Mr. Curran views the Act as discriminatory and maintains that the Act treats him as a second-class citizen simply because he has a disability.

22.    **Plaintiff Delaware ADAPT** is a grass roots community-based membership organization based in Delaware, that provides services by and for people with disabilities, including people with life-threatening disabilities.

23.    Delaware ADAPT began in 1996. Delaware ADAPT's projects are wide-ranging and include helping people with disabilities transition from nursing homes to the community, helping its members and other persons with disabilities secure the services they need to continue living in the community, and providing a focal point for community organizing to secure accessible transportation, and to protect and expand access to in-home supportive services.

24.    Delaware ADAPT has been injured as a direct result of Defendants' actions and omissions alleged herein. The interests Delaware ADAPT seeks to protect through this litigation are central to its core mission. This core mission includes helping its members and other persons

with disabilities to overcome the stigma and social pressures to isolate themselves in nursing homes and institutions, and to accept second-class services and health care, and ultimately to remove themselves from the world by dying an early death.  By facilitating the deaths of constituents who would have sought out and benefited from Delaware ADAPT services, Defendants' actions and omissions undermine the effectiveness of the programs and services Delaware ADAPT provides.

25.    Delaware ADAPT's core business activity is to assist its members and others to live outside of institutions such as nursing homes. The passage of EOLOA impairs Delaware ADAPT's ability to carry out its core business activities because it instead has to focus on providing additional educational programs to counteract the de-valuing of disabled lives under EOLOA and has had to divert already scarce resources to identify, investigate, and address EOLOA's impact on its constituents.  Because EOLOA threatens the lives of people with disabilities, Delaware ADAPT volunteers must spend substantial time to provide enhanced peer counseling and case management to ease the anxiety and fears regarding members' end of life decisions.

26.    **Plaintiff Freedom Center for Independent Living ("FCIL")** is a 501(c)(3) non-profit based in Middletown, Delaware, that provides services by and for people with disabilities. The organization's mission is to help people who live with significant disabilities, including life-threatening disabilities, to be independent in the community.  The organization serves all age groups and currently has around 70 active clients, which are called consumers.

27.    FCIL began in 2001 to serve the lower half of New Castle County in Delaware. FCIL's projects are wide-ranging, and include helping people with disabilities transition from nursing homes to the community, helping its consumers and other persons with disabilities secure

the services they need to continue living in the community, assisting with applications and referrals to government benefits, assisting with home modifications and assistive technology for individuals with disabilities, providing programming related to independent living skills and emergency management, and providing a focal point for community organizing to secure accessible housing and transportation.

28.    FCIL has been injured as a direct result of Defendants' actions and omissions alleged herein.  The interests FCIL seeks to protect through this litigation are central to its core mission.  This core mission includes helping its members and other persons with disabilities to overcome the stigma and social pressures to isolate themselves in nursing homes and institutions, to accept second-class services and health care, and ultimately to remove themselves from the world by dying an early death.  By facilitating the deaths of constituents who would have sought out and benefited from FCIL's services, Defendants' actions and omissions undermine the effectiveness of the programs and services FCIL provides.

29.    Defendants' promotion of physician assisted suicide through EOLOA harms FCIL's core business activities.  FCIL's core business activity is to assist people who live with significant disabilities, including life-threatening disabilities, to be independent in the community. Because EOLOA threatens the lives of people with disabilities, FCIL was actively involved in fighting the passage of the legislation and has already expended significant time and resources addressing the threat of assisted suicide within its services to its consumers.

30.    **Plaintiff United Spinal Association ("United Spinal")** is a national 501(c)(3) nonprofit membership organization that was founded by paralyzed veterans in 1946.  United Spinal is run by a Board of Directors, the majority of whom are people with disabilities, and staff that includes people with spinal cord injuries.   United Spinal is dedicated to empowering and

advocating for people living with spinal cord injuries and diseases ("SCI/D") and all wheelchair users, including veterans, to obtain greater independence and quality of life.  United Spinal's core business activity is to advance opportunities, social equity, and disability rights for all people living with a spinal cord injury or disease.  This includes work on issues such as increasing access to quality affordable health care and independent living services, enhancing and reforming government benefit systems, and preserving social security benefits—including in Delaware.

31.    United Spinal has approximately 70,000 members nationally, approximately 200 of whom reside in Delaware and access United Spinal's services.  United Spinal also works directly with specialized rehabilitation hospitals that serve Delaware residents, such as the Baltimore-based Kennedy Krieger Institute, the University of Maryland Rehabilitation and Orthopaedic Institute, MedStar National Rehabilitation Hospital, Jefferson Moss-Magee Rehabilitation Hospital, Project Walk New Jersey, and Adventist Rehabilitation Hospital of Maryland.

32.    Spinal cord injuries are often unexpected and initially devastating to the newly injured and their family members.  Newly injured members of United Spinal have faced and will continue to face significant possible challenges including loss of some independence, depression, isolation, loss of self-confidence, and anxiety about what the future will bring.  Many have initially had suicidal thoughts on occasion.  Many have also been depressed after injury and while living in the community.  In response to these needs, United Spinal operates a peer mentor support program that brings together people who have experience living with spinal cord injuries with others who are navigating similar challenges.  United Spinal's peer mentors provide information and support to members about their personal empowerment and suicide prevention.

33.    While United Spinal helps its members live independently and effectively in the community, some members are unable to do so because of systemic problems in the healthcare

and benefits systems as well as discrimination based on disability.  Many of United Spinal's members have directly experienced discrimination by medical professionals and others, including denial and delay of necessary medical services, by being told that their quality of life is poor and that if they had to live like them, they would kill themselves, as well as by being delayed or denied basic services and supports necessary for living at home with paralysis.

34.    People with spinal cord injuries generally consider themselves as having a static disability, one that can be addressed with the right care, services, and supports.  Some members have been told by doctors that their condition is "terminal," and that they may have a shortened amount of time to live—yet the dire predictions are often proved wrong.

35.    As a result of being perceived and labeled as terminally ill by their medical care providers, some of United Spinal's members will qualify for assisted suicide under the Act and are particularly vulnerable to being steered towards assisted suicide in a state of despair or depression. Upon information and belief, United Spinal members in Delaware have discussed and considered accessing lethal medications and/or committing suicide by means of the newly enacted EOLOA. The Act places United Spinal's members at risk of dying by offering the option of assisted suicide during a period of treatable depression and difficulty.  United Spinal brings this action on behalf of its members because the interests at stake are germane to United Spinal's purpose of empowering and advocating for people living with spinal cord injuries and diseases to obtain greater independence and a higher quality of life.

36.    United Spinal and its membership have been injured as a direct result of Defendants' actions and omissions alleged in the complaint.  In addition to placing United Spinal members at risk of both discrimination and premature death by assisted suicide, Defendants' actions and omissions have injured the organization's core business activity of empowering and

advocating for people with spinal cord injuries to obtain better quality of life and greater independence.  The passage of EOLOA is already harming United Spinal's ability to engage in its core mission because it instead must address and counteract concerns about assisted suicide in Delaware as well as advocating for members and constituents who are placed at imminent risk of harm by the passage of EOLOA and/or at risk of being steered toward utilizing assisted suicide once it goes into effect.  United Spinal has already had to expend resources on education and outreach campaigns targeted at addressing assisted suicide in other states.  This includes publishing a position statement opposing assisted suicide and a message from the organization's CEO about the dangers of the practice in other states.  United Spinal has held public information discussions to inform its members concerning assisted suicide laws and their impact on equality, dignity, and access to care for people with disabilities.  United Spinal is unable to devote these resources to its other critical programs.  By steering people with spinal cord injuries towards assisted suicide, EOLOA impedes United Spinal's mission of supporting its members in obtaining greater quality of life

37.    **Plaintiff National Council for Independent Living ("NCIL")** is the longest-running national, cross disability, grassroots organization run by and for people with disabilities. NCIL works to advance independent living and the rights of people with disabilities. NCIL's membership comprises centers for independent living ("CILs"), state independent living councils ("SILCs"), people with disabilities, and other disability rights organizations.

38.    There are two CILs in the State of Delaware.  Included among the two is co-Plaintiff, FCIL, a member organization of NCIL.

39.    NCIL was one of the key organizations that participated in the political and legislative process to pass the 1990 Americans with Disabilities Act, as well as working to pass

the Fair Housing Act Amendments of 1988, and amendments to the Individuals with Disabilities Education Act.

40.     NCIL is not only an advocacy organization, but an organization led and staffed by people with disabilities.  NCIL has an interest in protecting the rights of persons with disabilities to equal access offered to the general public.  NCIL provides support to a network of CILs and SILs across the United States, who in turn provide, among other things, peer support, individual and systems advocacy, and independent living skills training.  CILs are community-based, cross-disability, non-profit organizations that are designed and operated by people with disabilities. CILs are unique in that they operate according to a strict philosophy of consumer control, wherein people with all types of disabilities directly govern and staff the organization.

41.     CILs provide direct services and systems advocacy to ensure that the rights of people with disabilities are protected.  Even with the passage of the Americans with Disabilities Act, people with disabilities often find that advocacy and support from the disability community and the disability rights movement is an essential element in enforcement of the civil rights law. People with disabilities are not problems to be solved—they are individuals who seek only the same human dignity and civil rights afforded to everyone else.

42.     Defendants' promotion of physician assisted suicide through the Act poses a serious threat both to the mission of NCIL and to the well-being of the individuals and communities that NCIL serves.  The Act has labeled persons with life-threatening disabilities as "terminal," and has made physician assisted suicide readily available to anyone who is "terminal."   The label of "terminal"—which squarely implicates persons with life-threatening disabilities—is highly suspect.  Persons with life-threatening disabilities often lead long lives so long as they receive proper care.

43.    **Plaintiff Not Dead Yet ("NDY")** is a national disability rights organization formed in 1996 to articulate and organize the disability rights opposition to the legalization of assisted suicide, to oppose public policies that allow the involuntary withholding of life-sustaining medical treatment, and to advocate for equal protection of the law in cases of homicides of persons with disabilities.  NDY is headquartered in Rochester, New York and operates under the fiscal sponsorship of The Center for Disability Rights, Inc., a non-profit, community-based advocacy and service organization for people with all types of disabilities.

44.    NDY has been active in the State of Delaware.  Specifically, NDY has engaged in training, community organizing, legislative meetings, and providing testimony on the impact of physician assisted suicide.  Over the last year, NDY has been actively engaged in outreach conveying disability rights perspectives on topics related to assisted suicide and the medical ethics associated with assisted suicide.  NDY opposed assisted suicide laws or expansion bills through training, community organizing, legislative meetings, testimony, direct action and court efforts in 15 states (California, Connecticut, Hawaii, Massachusetts, Maryland, Minnesota, Montana, New Hampshire, Nevada, New York, Oregon, Rhode Island, Vermont, Washington, and Delaware).  NDY also provides input to policy makers in a variety of contexts, such as commenting on proposed regulations, urging appropriate action by public or private decision-makers, agencies, governmental or quasi-governmental bodies, and joining in policy letters with other disability rights organizations.

45.    NDY's core activity is to advance the rights of people with disabilities to live free from pressure from a medical care system grounded in the misconception that people with disabilities are leading lives that are not worth living.  Its work includes ensuring that the withholding or withdrawal of life-sustaining medical treatment is truly voluntary and based on

informed consent with meaningful alternatives, including long-term services and supports to live in the community; opposing futility policies involving unilateral or involuntary health care provider decisions to withhold or withdraw life-sustaining medical treatment; and advocating for equal protection of the law in homicide cases when the victim is old, ill, or disabled.

46.    NDY is injured as a direct result of Defendants' actions and omissions alleged herein. Defendants' actions impede its core mission of protecting persons with disabilities from involuntary withholding of life-sustaining medical treatment and medical rationing based on policies such as Quality Adjusted Life Years ("QALY"), ensuring that persons with disabilities receive equal protection of the law in cases of homicides of disabled persons, and protecting persons with disabilities from the expansion of assisted suicide schemes to additional jurisdictions and the removal of the few safeguards provided in existing schemes. EOLOA harms NDY's core mission by exposing persons with disabilities to a State-sponsored system of premature death by suicide, exclusively for persons with disabilities, in the case of so-called "terminal" disabilities, including such treatable problems as eating disorders.

47.    **Plaintiff Institute for Patients' Rights ("IPR")** is a national, 501(c)(3) organization that conducts and supports research and public education on healthcare disparities in the context of end-of-life issues. IPR is based in the State of New York and incorporated in the State of Delaware. IPR advocates to protect individuals' rights in numerous healthcare contexts, including by providing information about the discriminatory effects of assisted suicide laws and the dangers those laws pose to vulnerable individuals; opposing discriminatory crisis standards of care put in place during the COVID-19 pandemic that placed people with disabilities at risk of harm; advocating against the use of the QALY metric, which discriminates against and diminishes the value of the lives of people with disabilities; educating the public about disparities in healthcare

access and outcomes, including those based on race, age, and/or disability; and advocating for improvements to the quality of hospice and palliative care services, as well as for expanded access to these key services. IPR staff and board members regularly give presentations on these issues and engage with the press to raise awareness and educate the public on these topics.

48.    IPR is injured as a direct result of Defendants' actions and omissions alleged herein. IPR's core business activity is to help persons with disabilities get the care they need from the medical care system without the discriminatory barriers described above. EOLOA adds a new barrier by licensing medical provides to facilitate premature death in lieu of treatment. To address the harms of this new barrier, IPR has to develop new courses and materials to address the ways in which the scheme steers its constituents away from quality health care, and toward early death through prescription of lethal medications. By expending resources on these and other EOLOA-specific activities, IPR is unable to devote these resources to its other critical programs addressing the impact of discriminatory healthcare policies.

49.    IPR is a sister organization of non-party Patients' Rights Action Fund ("PRAF"), a national, non-partisan single-issue 501(c)(4) organization that protects the rights of patients, people with disabilities, older adults, and economically disadvantaged people from deadly harm and discrimination inherent in assisted suicide laws. PRAF lobbies and advocates in state legislatures and Congress for patient access to high-quality multidisciplinary end-of-life care and works against efforts that devalue and deprioritize healthcare for vulnerable people-such as QALYs and assisted suicide.

**B. Defendants.**

50.    **Defendant Governor Matthew Meyer ("Governor Meyer")** is sued in his official capacity as Governor of the State of Delaware. He is vested with the supreme executive

power of the State of Delaware (the "State") and has the duty to see that the State's laws are faithfully executed.  Governor Meyer possesses the authority to supervise and assign functions among executive officers and agencies, other than elective officers and agencies administered by elective officers.  Governor Meyer is tasked with appointing the members of the Medical Board and can remove any member of the board for neglect of duty, or on the recommendation of the board, after a hearing, due to the member's unprofessional or dishonorable conduct.  He signed into law EOLOA, which dramatically increases the danger of death by suicide to Plaintiffs, their members and constituents and all people with disabilities in Delaware.

51.    **Defendant Department of Health and Social Services (as previously defined, "DHSS")** is one of 16 cabinet-level departments appointed by the Governor.  DHSS's mission is to advance Delawareans' health and protect the places Delawareans live, learn, work, and play.  DHSS pursues its mission through broad-based health and environmental protection programs and activities including chronic disease prevention, general promotion of health and wellness, health facilities licensure and certification, consumer protection, and suicide prevention, among other activities.

52.    Under the Act, DHSS would be required to facilitate assisted suicide in part by making available on its website the forms providers must complete when participating under the Act; collect and review documentation submitted by medical providers pursuant to EOLOA, including assisted suicide requests and physician forms; regulate the collection of this information; and publish a report annually based on the information collected.[1]

53.    DHSS receives federal funds and previously received such funds at all times relevant to this complaint.  DHSS is also the parent agency of the Delaware Office of Suicide

---

[1] 16 *Del. C.* § 2511C.

Prevention, which was signed by Governor Meyer on August 20, 2025, and serves as "a place to reach all suicide prevention resources in the State."[2]

54.     **Defendant Secretary Christen Linke Young ("Secretary Young")** is sued in her official capacity as Secretary of DHSS.  In her position, she has control over the DHSS and is appointed by the Governor.

55.     **Defendant Delaware Board of Medical Licensure and Discipline (as previously defined, the "Medical Board")** is a government agency within the Delaware Division of Professional Regulation.  The Medical Board was instituted as part of the Medical Practice Act, 24 *Del. C.* § 1701, *et seq.*, for the purpose of regulating and controlling the practice of healing arts, which include establishing and enforcing the licensing standards for Medical Doctors (M.D.s), Doctors of Osteopathy (D.O.s), Physician Assistants (P.A.s), and Anesthesiology Assistants (A.A.s).

56.     The Medical Board is a Type I Board, meaning that it is policy autonomous and comprised of professional and public members (eight persons certified and registered to practice medicine (at least one of whom is a D.O.), two P.A.s, five public members, and the Director of the Division of Public Health or their designee).[3]  The Medical Board investigates the unlicensed practice of medicine, and its decisions are not subject to administrative review.  It also has the power to promulgate rules; make investigations, hold hearings, and take evidence in accordance with the Medical Practice Act; and report complaints of potentially criminal conduct to law enforcement.  Licensure is mandatory to practice medicine in Delaware or to treat Delaware patients.

---

[2] 16 *Del. C.* § 6203(c)(1).

[3] 24 *Del. C.* § 1710.

57.    **Defendant Joseph Parise, D.O. ("Dr. Parise")** is sued in his official capacity as the President of the Medical Board.  His duties include administering the licensing, regulatory, and disciplinary functions of the Medical Board.

58.    **Defendant Delaware Board of Nursing (as previously defined, the "Nursing Board")** is a government agency within the Delaware Division of Professional Regulation.  The Nursing Board regulates the licensure and discipline of Advanced Practice Registered Nurses ("APRN") under the Delaware Nurse Practice Act.  19 *Del. C.* § 1901, *et seq.*  The Nursing Board consists of fifteen members, including at least five registered nurses, one licensed practical nurse, and two advanced practice nurses.  19 *Del. C.* § 1903.  All members are appointed by the Governor. *Id.*  The Nursing Board adopts rules and regulations, licenses nurses, investigates and hears disciplinary charges, and causes the prosecution of persons violating the Nurse Practice Act.  19 *Del. C.* § 1906.  Licensure is mandatory for APRN's to treat Delaware patients.

59.    **Defendant Jacqueline Mainwaring ("APRN Mainwaring")** is sued in her official capacity as President of the Nursing Board.  Her duties include administering the licensing, regulatory and disciplinary functions of the Nursing Board.  Ms. Mainwaring is an APRN.

60.    Defendants, collectively and through their respective duties and obligations, are responsible for administering and/or enforcing the Act.  Each Defendant, and those subject to their direction, supervision, and control, has the responsibility to intentionally perform, participate in, aid and/or abet in the administration or enforcement of the Act.

## FACTS

### A. Suicide.

61.     Suicide is death caused by injuring oneself with the intent to die.  Death from suicide "is highly prevalent in already marginalized and discriminated groups of society."[4]  The Centers for Disease Control and Prevention ("CDC") reports that suicide is "[o]ne of the 10 leading causes of death in the United States."[5]  Between 2001 and 2021, national suicide rates increased most years.[6]

62.     Legal responses to suicide have evolved since the founding of the United States.  Suicide itself was a crime at the nation's founding, with "punishments" exacted against the property of the decedent.  By the end of the 19th century, most U.S. states had changed their laws so that suicide itself was no longer a crime.  Reformers sought to decriminalize suicide itself as part of a recognition that suicide was caused by mental illness.  Removing the criminal penalties against suicide reduces social stigma, helps remove barriers to obtaining adequate mental health care, increases access to emergency medical services, fosters suicide prevention activities, improves the well-being of people vulnerable to suicidal behaviors, and contributes to more accurate monitoring of suicidal behaviors.

---

[4] World Health Org., Preventing Suicide: A Global Imperative 3 (2014), https://apps.who.int/iris/bitstream/handle/10665/131056/9789241564779_eng.pdf?sequence=1.

[5] U.S. Surgeon General & Nat'l Action Alliance for Suicide Prevention, The Surgeon General's Call to Action to Implement the National Strategy for Suicide Prevention 11 (2021), https://www.hhs.gov/sites/default/files/sprc-call-to-action.pdf.

[6] Cheryl Platzman Weinstock, *Decades of National Suicide Prevention Policies Haven't Slowed the Deaths*, KFF Health News (Sept. 16, 2024), https://kffhealthnews.org/news/article/national-suicide-prevention-strategy-action-plan-rising-rates-deaths/.

63.     The act of assisting suicide, however, remains criminalized in most states, as it has been since the founding of this country.[7]  Intentionally causing or aiding another person to die by suicide remains a class F felony in Delaware.  *See* 11 *Del. C.* § 645.

64.     In the United States, 26% of all adults, and 43.8% of adults over 65 reported a functional disability in 2018.[8]  People with disabilities are significantly more likely than those without disabilities to report suicidal ideation, suicide planning, and suicide attempts.[9]  Among persons with any disability, those with cognitive impairments, and impairments involving self-care and/or independent living tasks, have the highest risk of suicidal thoughts, suicide planning, and suicide attempts.[10]

65.     In 2021, the most recent year for which annual data is available, the age-adjusted suicide fatality rate in Delaware was 13.5 per 100,000.[11]  During 2021, 134 people died by suicide in Delaware.[12]  The suicide rate increased 15% from 2016 to 2021.[13]

---

[7] *Washington v. Glucksberg*, 521 U.S. 702, 715 (1997) ("By the time the Fourteenth Amendment was ratified, it was a crime in most States to assist a suicide.").

[8] Nicole M. Marlow, Zhigang Xie, Rebecca Tanner, Ara Jo, & Anne V. Kirby, Association Between Disability and Suicide-Related Outcomes Among U.S. Adults, 61 AM. J. PREVENTATIVE MED. 852, 854 (2021).

[9] *Id.*

[10] Nicole M. Marlow, *et al.*, *Association Between Functional Disability Type and Suicide-Related Outcomes Among U.S. Adults with Disabilities in the National Survey on Drug Use and Health, 2015-2019*. 153 J. PSYCHIATR. RES. 213 (2022).

[11] Delaware Department of Health and Social Services, *Key Data and Reports: Suicide in Delaware* (May 29, 2024), https://myhealthycommunity.dhss.delaware.gov/topics/suicide/state.

[12] *Id.*

[13] *Id.*

**B. Delaware's Suicide Prevention Programs.**

66.    Delaware offers and provides extensive suicide prevention programs and services. The State of Delaware Suicide Prevention Plan, first approved in 2013 and extended through 2023, outlines the State's strategies and goals for suicide prevention.  The Suicide Prevention Plan's goals and objectives include:  promoting suicide prevention as "a core component of health care services"; promoting "the understanding that recovery from mental and substance use disorders is real and possible for all"; promoting "the safe disclosure of suicidal thoughts and behaviors by all persons" to healthcare clinicians and professionals; and promoting "efforts to reduce access to lethal means of suicide among individuals with identified suicide risk."[14]  The Plan also seeks to increase public and private funding for suicide prevention research and to establish research-informed programs that promote wellness and prevent suicide and related behaviors.  The Suicide Prevention Plan is required to be updated no fewer than every three years by the Office of Suicide Prevention, with the approval of the Suicide Prevention Coalition.  *See* 16 *Del. C.* §§ 6201, 6203.

67.    Delaware's Suicide Prevention Coalition is a twelve-member coalition established by statute that reviews and analyzes statistics related to suicide and suicide attempts, consults with the Division of Public Health to determine the prevalence of suicide, implements methods to reduce suicide and attempts, and operates in accordance with the Suicide Prevention Plan.[15] Coalition members consist of representatives from various government agencies, including the Division of Substance Abuse and Mental Health, Division of Prevention and Behavioral Health Services, and Division of Public Health.  The Secretary of DHSS and the Governor together

---

[14] State of Delaware Suicide Prevention Plan, July 2013-July 2018 (approved July 17, 2013 and extended to July 2023), https://sprc.org/wp-content/uploads/2022/11/Delaware-Suicide-Prevention-Action-Plan_2013-2018.pdf.

[15] 16 *Del. C.* § 6201.

appoint six of the twelve coalition members.  The coalition is staffed by the Division of Substance Abuse and Mental Health and annually reports to the General Assembly and Governor with findings and recommendations.

68.    The Office of Suicide Prevention ("OSP") is an office within the Delaware Division of Substance Abuse and Mental Health, which itself is a part of DHSS.  The office was recently established by House Bill No. 54, which was signed into law by Defendant Governor Meyer on August 20, 2025.[16]  OSP is currently the lead government entity in Delaware for suicide prevention intervention and postvention efforts.  The duties of the OSP include assisting the Suicide Prevention Coalition; providing guidance to stakeholders and community organizations; overseeing funding for suicide prevention; and creating the State's Suicide Prevention Plan. Beginning on October 15, 2026, the OSP will be required to prepare an annual report for the General Assembly and Governor that outlines the work of the OSP and progress made towards suicide prevention.  DHSS has already identified a vacant position to be reclassified into the OSP's needs and existing federal grant funding will cover the cost of the position.  The cost is estimated to be $78,681 for fiscal year 2026.[17]

---

[16] House Bill No. 54, 153rd General Assembly (Aug. 20, 2025).  *See also* 16 *Del. C.* § 6203.

[17] *Press Release, Morrison Introduces Bill to Create Delaware Office of Suicide Prevention*, Delaware House Democrats (Mar. 6, 2025), http://housedems.delaware.gov/2025/03/06/morrison-introduces-bill-to-create-delaware-office-of-suicide-prevention; *Delaware could soon get an Office of Suicide Prevention if Gov. Meyer signs the bill*, DELAWARE ONLINE (July 2, 2025), https://www.delawareonline.com/story/news/politics/2025/07/02/office-of-suicide-prevention-coming-to-delaware-if-governor-matt-meyer-signs-house-bill-54/84413583007.

69.    DHSS collects data regarding suicides in Delaware,[18] including information from state death certificates.[19]  Under EOLOA, DHSS will exclude assisted suicide from these datasets. DHSS also operates the Delaware Violent Death Reporting System, which is part of the National Violent Death Reporting System, funded by the U.S. Centers for Disease Control and Prevention, and publishes detailed information about suicides, including rates, locations, age, method and location.[20]  As a result of EOLOA, DHSS will provide false and inaccurate information to the National Violent Death Reporting System, as it will knowingly exclude suicides by persons provided lethal prescriptions under EOLOA.

70.    DHSS, in its implementation and enforcement of EOLOA, deprives people with life-threatening disabilities of the protections of these programs and services designed to identify and protect persons who are at risk of suicide, fails to investigate and accurately report on actual deaths of persons under EOLOA, and knowingly permits inaccurate information to be collected and reported about prescriptions and deaths by suicide under EOLOA.  EOLOA does not allow physician assisted death under the Act to be treated as suicide, assisted suicide, or euthanasia "for any purpose."  *See* 16 *Del. C.* § 2512C.  This mandate directs that the cause of death on a patient's death certificate must be falsely reported as the underlying "terminal illness" rather than the real proximate cause—death by suicide.  Neither DHSS, nor any other Delaware governmental agency

---

[18] *See Suicide Data for Delaware*, Del. Health and Soc. Servs., https://myhealthycommunity.dhss. delaware.gov/topics/suicide/state.

[19] *Deaths*, Del. Open Data, https://data.delaware.gov/Health/Deaths/nck5-dhqv/about_data.

[20] *Violent Deaths*, Del. Health and Soc. Servs., https://dhss.delaware.gov/wp-content/uploads/ sites/10/dph/pdf/violentdeathsde2000_2017.pdf (last visited Oct. 22, 2025).  *See also id.* at 1 ("Intentional injury deaths include both homicides and suicides and are most commonly referred to as violent deaths.").

is charged with following up and/or investigating the circumstances of these deaths to assess whether the theoretical protections in the law were followed in practice.

**C. Delaware's End of Life Options Act.**

71.     EOLOA was signed into law by Defendant Governor Meyer on May 20, 2025, and will become effective on either January 1, 2026, or once final regulations are in place, whichever is sooner.  Once in effect, the law will allow dispensing lethal drugs to a patient who makes two oral requests a minimum of fifteen days apart, plus a written request.  *See* 16 *Del. C.* § 2505C. Before providing the lethal drugs, the provider must confirm that the patient has an "incurable and irreversible disease, illness, or condition that as a medical probability, will result in death within six months," that the patient has "voluntarily" requested the drugs, and that the patient has "decision-making capacity."  16 *Del. C.* § 2508C.  The prescribing provider can be either an attending physician or attending APRN.  Under Delaware law, an APRN, or Advanced Practice Registered Nurse, is a registered professional nurse certified by Defendant Nursing Board to prescribe medications.  *See* 24 Del. Admin. Code § 1900-8.0.  Even though APRNs are not permitted to certify patients as terminal within six months for purposes of hospice placement under Medicare (*see* 42 U.S.C. § 1395f(a)(7)(A)(i)(I)), EOLOA allows APRNs to make the same certification of terminal within six months as physicians for purposes of prescribing lethal medications.

72.     The attending provider is supposed to refer the patient to a consulting provider to confirm the terminal diagnosis, decision-making capacity, and that the patient is making a voluntary, informed choice.  16 *Del. C.* § 2509C.  The consulting provider also need not be a physician.  *Id.*

73.     The Act does not require a mental health assessment for the patient requesting assisted suicide.  The provider must only refer a patient to a mental health professional if the provider believes "that the individual may not have decision-making capacity."  16 *Del. C.* § 2510C.  However, the Act does not provide any standards to guide providers in making this determination, nor does it require training in mental capacity assessment.

74.     EOLOA assumes that a request for assisted suicide is not an indication of a mental disorder.  This is despite the fact that other Delaware laws make precisely the opposite assumption for virtually everyone else.  Moreover, those laws require interventions up to and including involuntary hospitalization to test the assumption and diagnose the condition.  Even though Plaintiffs do not condone this,[21] this involuntary hospitalization is both the law and standard of care in other circumstances, showing the inherent irrationality of EOLOA.

75.     In determining whether a person's condition meets the definition of "terminal illness," EOLOA has no requirement that the attending or consulting provider consider the effect of treatments, counseling, or other supports on survival rates.  16 *Del. C.* § 2502C(10).  People who would otherwise survive beyond six months if provided treatment or other supportive services will still be eligible for assisted suicide regardless of whether those treatments or supports are denied by their insurance company, refused, or otherwise not available.  As a result, conditions that would not otherwise be considered "terminal" with treatment—such as spinal cord injuries, diabetes, complications from falls, hernias, eating disorders, and kidney disorders requiring dialysis—can and will qualify for assisted suicide under the Act.

---

[21] Plaintiffs support voluntary mental health treatment and services that are comprehensive, community-based, recovery-oriented, and culturally and linguistically competent.  Nothing in this complaint should be construed as recommending or supporting involuntary treatment of any kind.

76.    In addition, the law permits a patient to make themselves eligible for assisted suicide by declining available medical treatment that would likely extend their lives, such as a known medical treatment for their disease, kidney dialysis, insulin, or even food and water. VSED—Voluntary Stopping Eating and Drinking—is the practice of hastening death by foregoing food and water.  In other places where assisted suicide has been allowed, there are providers who will certify a patient as "terminal" within six months based on a patient's having begun VSED, regardless of whether there is an underlying medical condition.  Such providers advocate for the use of VSED as a "bridge" to qualify for lethal drugs under EOLOA for conditions that would otherwise not be considered terminal.[22]

77.    The attending and consulting providers need not even ever see the suicidal patient in person, as the Act does not prohibit providers from examining, evaluating, and prescribing lethal drugs to patients remotely.

78.    EOLOA fails to require that people meaningfully consider, exhaust, and/or knowingly reject less restrictive, truly viable alternatives to assisted suicide, including suicide prevention services, palliative and/or hospice care, medical and nursing support services, and other personal support services that are ostensibly included among the "feasible alternatives" that Delaware providers are supposed to discuss with persons who seek assisted suicide.  The Act fails to require the provision or exhaustion of the State's suicide prevention program, which is expressly designed to address the underlying concerns that drive people to suicidal thoughts and deter people

---

[22] *See* Thaddeus Mason Pope & Lisa Brodoff, *Voluntary Stopping Eating and Drinking As a Bridge to Medical Aid in Dying*, 1 J. OF AID-IN-DYING MEDICINE 76 (2023), https://heyzine.com/flip-book/2ce721e795.html#page/77.  In this article, proponents present the case of Cody Sontag, a woman in Oregon in the early stages of Alzheimer's disease, who started VSED on February 8, 2023; on day five, Sontag's physician qualified her for assisted suicide on the grounds that she was dying from dehydration and therefore had a prognosis of six months or less.  Sontag died by assisted suicide, not VSED, on day eight.

from taking uninformed, untreated, or otherwise preventable suicidal actions. The Act directs providers to advise the patient of alternative treatment options, but the requirement is only to "discuss[]" what is "feasible," not actually offer options such as hospice, mental health treatment, and palliative care. 16 *Del. C.* § 2508C. The Act also requires providers to advise the patient of the risks and results associated with taking the lethal drug and to confirm that the patient's request did not result from coercion or undue influence but has no standard to determine what is coercion or undue influence. *Id.*

79. The Act permits provider shopping, such that if one provider finds the person ineligible, the person can contact additional physicians or advance practice nurses until they get approval for assisted suicide. EOLOA lacks any independent oversight for the decision to grant an assisted suicide request (*i.e.*, review by a court, as with civil commitments). The ability to "shop" providers combined with the lack of oversight enables easy evasion of the Act's supposed safeguards against duress, neglect, and abuse.

80. The law requires that the patient self-administer the drugs but does not provide for oversight at the time of administration. 16 *Del. C.* § 2508C. There are no witness requirements at time of ingestion, no requirements that the attending provider be present or informed of the person's death, and no obligation to inform authorities of the true manner or cause of death. There is no way of knowing whether the drugs were administered voluntarily or without coercion, whether the patient's judgment was impaired at the time of ingestion, whether the patient is still "terminal" at the time of ingestion, or if they pursued treatment or cured their condition but chose to ingest the drugs anyway. The Act does not require any evidence that the person ingested the lethal drugs themselves, that is, whether the person self-administered the lethal drugs as required by the Act or whether anyone else (family member, nurse, physician, other healthcare provider,

friend, or other person) administered the medication or physically assisted the person.  The time that the person ingests the lethal drugs may be days, weeks, months, or even years after the request for assisted suicide was approved.

81.    The Act then compels coroners to falsify the cause of death: rather than accurately identify the cause of death as suicide, a coroner is statutorily required to instead list the putative "terminal illness."  In addition to compelling coroners to falsify official records, this provision is designed to hide information regarding the occurrence and rate of assisted suicide by ensuring such information never exists.  Under EOLOA, assisted suicide "does not, for any purpose, constitute elder abuse, suicide, assisted-suicide, homicide, or euthanasia." 16 *Del. C.* § 2512C.

82.    Delaware criminal law contains many protections for older people, dependent adults, and persons with disabilities, acknowledging as a separate category of offense certain crimes against vulnerable adults and authorizing harsher penalties for them.  *See* 11 *Del. C.* § 1105. Delaware law also makes it unlawful for caregivers to fail to report known or suspected incidents of abuse, including of older or dependent adults.  *See* 16 *Del. C.* § 1132(a)(1).

83.    However, these laws will not be enforced against doctors and nurses who prescribe assisted suicide to people with life-threatening or "terminal" disabilities—even if their doctor prescribes drugs that result in a distressing or botched suicide attempt or are ultimately administered by another person.  EOLOA "does not limit" prosecution for violations of its procedures, but the Act does not require anyone to report violations or require any state agency to investigate or any law enforcement agency to prosecute violations.  *See* 16 *Del. C.* § 2513C.

84.    Physicians in Delaware have a duty to provide health care that falls within what is known as the "standard of care."  Delaware's pattern civil jury instructions define the standard of care as "that degree of skill and care ordinarily employed" in a field of medicine "and the use of

reasonable care and diligence."[23]  For persons without life-threatening disabilities, Delaware law imposes a standard of care requiring providers to respond to suicidal wishes in a way that protects the person's life.  However, under EOLOA, providers cannot be subject to civil or criminal liability, or professional disciplinary action if they meet the exceptionally low standard of "good faith" observance of EOLOA's minimal documentation requirements.  16 *Del. C.* § 2513C.  Additionally, complying with a request under the Act for lethal drugs cannot "constitute neglect or elder abuse for any purpose" if the provider acts in good faith compliance with the Act.  16 *Del. C.* § 2512C.

85.    Under EOLOA, DHSS is required to collect data about the prescription and dispensing of lethal drugs under the Act.  DHSS is permitted, but not required, to review annually the records it collects to assess compliance with the Act.  16 *Del. C.* § 2511C.  Upon information and belief, and based on the experiences of other U.S. states with assisted suicide laws, Delaware will not adequately review records collected under EOLOA to ensure assisted suicides conform to the requirements set out in the Act.

86.    The purported safeguards in EOLOA are illusory, and will be frequently disregarded and/or circumvented in ways that will harm and discriminate against people with life-threatening disabilities.

**D.  People with Life-Threatening Disabilities.**

87.    All people in Delaware who will qualify for EOLOA by having a "terminal illness" will have conditions that qualify as disabilities under the ADA and Section 504.  Under EOLOA, "terminal illness" means "an incurable and irreversible disease, illness, or condition that as a medical probability, will result in death within 6 months."  16 *Del. C.* § 2502C(17).  All "terminal

---

[23] Del. Pattern Jury Instr., Civil 7.1A.

illnesses" under EOLOA are also disabilities under the ADA and Section 504 because they are physical impairments that substantially limit major life activities including operation of major bodily functions, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions. 42 U.S.C. § 12102(2)(B). These conditions also substantially limit people in other major life activities including caring for oneself, performing manual tasks, eating, sleeping, walking, and breathing as defined in 42 U.S.C. § 12102(A). EOLOA will thus be available only to people with disabilities.

**(1)    Spinal Cord Injuries.**

88.    As the term suggests, a spinal cord injury involves damage to the spinal cord.[24] Depending on the location and severity of the spinal cord damage, spinal cord injuries can result in loss of feeling and movement in the legs, pelvis, trunk, and arms. Spinal cord injuries can also result in spasms, loss of bladder control, pain, changes in sexual function, and trouble breathing, coughing, or clearing secretions from the lungs.

89.    Spinal cord injuries are not ordinarily considered "terminal" given available treatments, but many spinal cord injuries can and do qualify for assisted suicide. Patients with spinal cord injuries qualify as "terminal" because their injury will often result in death without surgery and/or supportive services. Furthermore, some spinal cord injuries result from other terminal conditions such as cancer.

90.    People with spinal cord injuries are at a greater risk of suicide relative to the general population, especially when first adjusting to living with a spinal cord injury. Many newly injured

---

[24] Spinal Cord Injury – Symptoms and Causes, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/spinal-cord-injury/symptoms-causes/syc-20377890#:~:text=Overview,the%20site%20of%20the%20injury (last visited Oct. 14, 2025).

individuals experience depression and suicidal thoughts as they navigate adapting to a new future. Additionally, people with visible disabilities such as spinal cord injuries are more likely to be perceived as terminally ill and therefore particularly vulnerable to being steered towards assisted suicide in a state of initial despair or depression shortly after their original injury.

### (2)    Eating Disorders.

91.    Eating disorders may involve avoiding or restricting intake of food (anorexia), and/or taking measures to expel ingested calories, such as inducing vomiting (bulimia). People with eating disorders are persons with disabilities under the ADA and Section 504 because eating disorders involve mental and physical impairments that substantially limit not only the major life activity of eating itself, but all of the other major life activities that depend on a reasonable level of nutrition.

92.    A projected 26,000 women and 11,000 men in Delaware may experience an eating disorder in their lifetime.[25] Nationwide, teenagers are suffering from eating disorders at a younger age and more severely than ever before.[26] From 2018 to 2022, eating disorder-related health visits jumped 107.4% for people younger than 17.[27] Health organizations declared a national emergency in 2021 due to the increase in prevalence of mental health disorders in young people, including eating disorders.[28]

---

[25] Del. Sen. Conc. Res. 121, 152nd Gen. Assem., Reg. Sess. (Del. 2024).

[26] Caroline Hopkins, *Eating disorders among teens more severe than ever*, NBC NEWS (Apr. 29, 2023), https://www.nbcnews.com/health/health-news/eating-disorders-anorexia-bulimia-are-severe-ever-rcna80745.

[27] *Id.*

[28] Lakshmi Radhakrishnan, *et al.*, *Pediatric Emergency Department Visits Associated with Mental Health Conditions Before and During the COVID-19 Pandemic – United States, January 2019 – January 2022*, Centers for Disease Control and Prevention, Feb. 25, 2022, https://www.cdc.gov/mmwr/volumes/71/wr/mm7108e2.htm.

93.    Eating disorders are themselves a form of mental illness, to which the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) devoted an entire chapter.[29]  Co-morbidity between eating disorders and other mental illnesses is high, with over half of the people with anorexia meeting the criteria for anxiety disorders, mood disorders, impulse control disorders, or substance use disorders.[30]  Co-morbidity is even higher for bulimia, with over 90% of people with bulimia having another mental illness.[31]  The Academy for Eating Disorders considers anorexia nervosa and bulimia nervosa as well as their variants to be "biologically based, serious mental illnesses (BBMI) that warrant the same level and breadth of health care coverage as conditions currently categorized in this way (*e.g.*, schizophrenia, bipolar disorder, depression, obsessive-compulsive disorder)."[32]  BBMIs impair judgment.[33]

94.    Decision-making in patients with eating disorders is significantly altered.[34]  One of the hallmark symptoms of an eating disorder is "[t]he delusional level of cognitive distortions regarding food and body image [which] is the irrational lens through which the decision to refuse treatment and to seek MAID [Medical Aid in Dying, a euphemism for assisted suicide] is

---

[29] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 539-50 (4th ed. 1994).  The more recent DSM-5-TR includes Anorexia Nervosa and Bulimia Nervosa in the overall chapter on Feeding and Eating Disorders.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 381-92 (5th ed. text rev. 2022).

[30] National Institute of Mental Health, *Eating Disorders*, https://www.nimh.nih.gov/health/statistics/eating-disorders.

[31] *Id.*

[32] Kelly L. Klump, *et al.*, *Academy for Eating Disorders Position Paper: Eating Disorders Are Serious Mental Illnesses*, 42 INT'L J. EATING DISORDERS 97 (2009), https://evelyntribole.com/wp-content/uploads/AED-Eating-Disordrs.Mental-Illness.pdf.

[33] *Id.* at 98.

[34] S. Guillaume, *et al.*, *Impaired decision-making in symptomatic anorexia and bulimia nervosa patients: a meta-analysis*, 45 PSYCHOLOGICAL MEDICINE 3377 (2015), https://pubmed.ncbi.nlm.nih.gov/26497047/.

filtered."[35]    Individuals almost always regain decisional capacity with weight restoration.[36] Treatments for eating disorders include psychotherapy, medical care and monitoring, nutritional counseling, and medications.[37]

95.    People with eating disorders are at a higher risk of suicide and suicide is a leading cause of death for people with anorexia.[38]  A guide to best practices for medical care for eating disorders authored by the Academy for Eating Disorders instructs medical professionals to "[a]lways assess for psychiatric risk, including suicidal and self-harm thoughts, plans and/or intent."[39]

96.    The concept of "terminal anorexia" first emerged in a journal article in 2022.[40] Since then, other eating disorder experts have criticized the diagnosis as an invalid construct that cannot be adequately defined.[41]  First, the diagnosis of terminal anorexia is precarious given the

---

[35] Patricia Westmoreland, *et al.*, *"Terminal Anorexia": An Invalid Construct That Does Not Justify Medical Aid in Dying*, PSYCHIATRIC TIMES (Oct. 11, 2023), https://www.psychiatrictimes.com/view/terminal-anorexia-an-invalid-construct-that-does-not-justify-medical-aid-in-dying.

[36] *Id.*

[37] National Institute of Mental Health, *Eating Disorders: What You Need to Know* (2024), https://www.nimh.nih.gov/health/publications/eating-disorders#:~:text=Commoneatingdisorders includeanorexia,differentbutsometimesoverlappingsymptoms.

[38] *Id.*

[39] Academy for Eating Disorders, *Eating Disorders: A Guide to Medical Care 18* (4th ed. 2021), https://higherlogicdownload.s3.amazonaws.com/AEDWEB/27a3b69a-8aae-45b2-a04c-2a078d0 2145d/UploadedImages/Publications_Slider/2120_AED_Medical_Care_4th_Ed_FINAL.pdf .

[40] Jennifer L. Gaudiani, Alyssa Bogetz & Joel Yager, *Terminal anorexia nervosa: three cases and proposed clinical characteristics*, J EATING DISORDERS, (Feb. 15, 2022) at 1, https://jeatdisord.biomedcentral.com/articles/10.1186/s40337-022-00548-3.

[41] Patricia Westmoreland, et al., *"Terminal Anorexia": An Invalid Construct That Does Not Justify Medical Aid in Dying*, Psychiatric Times (Oct. 11, 2023), https://www.psychiatrictimes.com/view/terminal-anorexia-an-invalid-construct-that-does-not-justify-medical-aid-in-dying (citing a longitudinal study finding that two-thirds of individuals with anorexia nervosa recovered after 22 years).

inherent nature of the illness and its treatability. People can, and frequently do, recover from anorexia, and there is no clinical evidence to indicate who will recover and who will not. Further, the ambivalence or complete opposition to treatment that is common with individuals with eating disorders suggests that many individuals will not have engaged with treatment options before turning to assisted suicide.

97.     Prescribing life-ending drugs to a person with severe anorexia without a mental health assessment is tantamount to "colluding with the disease itself."[42]  A person with anorexia described the impact of this shift as follows:  "When I was diagnosed with anorexia, the prognosis was bleak—I was told full recovery was near impossible.  I began researching methods to take my own life, including countries that had legalized euthanasia and medical aid in dying.  I can only imagine if my diagnosis had included the word 'terminal.'  Only I don't imagine.  I know.  I would be dead."[43]

98.     In Colorado, where EOLOA has been in effect since 2016, state record keeping lists seventy-five deaths from 2017 to 2024 as falling in the "other illnesses/conditions" category and state officials have noted a growing number of cases for which the terminal condition was identified as "severe protein calorie malnutrition." Thirty cases were reported between 2021 and 2024—including eighteen in 2024 alone—compared to zero cases in previous years.[44]

99.     Under the Colorado EOLOA, Jane, a twenty-nine-year-old woman, was provided

---

[42] *Id.*

[43] Chelsea Roff and Dr. Catherine Cook-Cottone, *The Dangers of Assisted Suicide To Those With Eating Disorders*, https://static1.squarespace.com/static/58e4b708f5e2312cc949b8b4/t/66e828 dde88bf757b8f0acc3/1726490860329/Assisted+Suicide+in+Eating+Disorders+Report+- +US+Version.pdf.

[44]  Colorado End-of-Life Options Act, 2024 Data Summary, with 2017-2024 Trends and Totals, Center for Health and Environmental Data, Colorado Department of Public Health and Environment, https://drive.google.com/file/d/1S3yC6qkS15rywRVUhV_J6CuD3202k2nZ/view.

with lethal drugs while in the midst of a mental health crisis. Jane was diagnosed with an eating disorder at age fourteen and received treatment for most of her life. During one of Jane's hospitalizations, Jane's parents were informed that Jane's providers had placed her on hospice care and had participated in the process of providing lethal drugs to Jane under EOLOA. Jane's father intervened as legal guardian, and a probate court ordered the medications removed from Jane's possession. Jane was subsequently discharged from hospice and recovered.

100.    Notably, at the time Jane was approved as eligible for assisted suicide, she was being discharged from hospice due to the fact she was no longer eligible for hospice services, and while in hospice, the hospice had also not considered her competent. Regardless, she was still found eligible for assisted suicide. But for the intervention of her parents and the probate court, she may have ended her life under EOLOA. She lived independently for two years, working as an Occupational Therapist, purchasing a home, travelling on vacation, and making new friends. She died in May 2024 of severe shock while being treated for a heart condition.

**(3)    Terminal Illness and the Dying Process.**

101.    Persons who may not have been disabled before their terminal illness will, unless they die suddenly, become disabled as their illness and treatment impairs their ability to perform major life activities such as caring for oneself, eating, sleeping, walking, and bathing. The onset and progression of terminal illness are themselves causes of suicidal ideation. Persons approaching death are understandably concerned about pain, loss of independence and loss of dignity as others take on their intimate care. All of these concerns can be addressed by palliative medicine, and quality end of life care. Palliative medicine and good end of life care, however, are expensive and difficult to access for many individuals. Persons approaching death are as deserving of suicide prevention services as are those without terminal illnesses. Many people facing

imminent death suffer from depression, which is treatable even in the presence of late-stage illness.[45]  In the words of one study on the topic:

> Few requests are more confusing or anxiety provoking for a physician than a dying patient's request to hasten his or her own death. Physicians should recall that such a request is typically a means for a patient to communicate some form of distress to his or her doctor; rarely is it a declaration of suicide intent. By inquiring about this distress, a physician can begin to address its underlying cause and to improve the quality of life for the terminally ill patient.[46]

102.    EOLOA diverts persons approaching death away from suicide prevention services, and effective palliative care, and to state sponsored suicide in a way that would be unthinkable for persons without terminal illnesses.   It does so solely on the basis of disability.

**E. Defendants Deny People with Life-threatening Disabilities Equal Access to State-Based Programs and Services, in Violation of the ADA, Section 504, and Equal Protection Clause.**

**(1)    Defendants Administer an Unequal Two-Track System of Suicide Prevention Services, with One Track for People with Certain Disabilities and a Separate Track for All Others.**

103.    Defendant DHSS receives federal funds to administer suicide prevention initiatives in Delaware and is responsible for providing suicide prevention services, including by providing resources to counties for suicide prevention trainings and programs as well as by connecting individuals in crisis to immediate assistance through its Office of Suicide Prevention.

104.    Delaware law mandates that people who are an imminent danger to themselves are connected to mental health services.  *See* 16 *Del. C.* § 5001, *et seq.*  When a person in Delaware who does not have life-threatening disabilities expresses suicidal intentions to a physician or nurse,

---

[45] Gay Maytal, Theodore A. Stern, *The Desired for Death in the Setting of Terminal Illness:  A Case Discussion*, PRIM. CARE COMPANION, J. CLIN. PSYCHIATRY 2006; 8(5) at 299, 304.

[46] *Id.*

the standard of care requires the above suicide prevention programs, services, and/or activities to be made available to the person.  If that person does not pursue those resources and maintains an interest in suicide, the standard of care is not to help the patient kill himself or herself, nor to leave him or her to their own devices.  Instead, an entire system of prevention measures is deployed around the person including, emergency behavioral health services and/or inpatient programs.

105.    Defendants are aware of the heightened risk factors associated when a person has a life-threatening disability, and requests assisted suicide—including the fact that such a person likely has depression that impairs the person's ability to make informed decisions—yet Defendants fail to ensure that the suicide prevention programs in place are equally available to those individuals.  Under EOLOA, Defendants permit the withholding of suicide prevention services and interventions when the person has a life-threatening disability.  In a 2019 letter to the U.S. Department of Health and Human Services, the National Council on Disability described this situation as "a double standard in suicide prevention efforts" given that people with life-threatening disabilities "are not referred for mental health treatment when seeking assisted suicide, while people without disabilities receive such referrals."[47]

106.    By relegating people with life-threatening disabilities to a less effective, unequal, and separate program for people expressing suicidal ideation, EOLOA: (1) "den[ies] qualified individual[s] with [] disabilit[ies] the opportunity to participate in or benefit from" behavioral health programs, including suicide prevention, hospitalization, and medication services, in violation of 28 C.F.R. § 35.130(b)(1)(i); (2) affords qualified individuals with disabilities an

---

[47] Letter from Neil Romano, Chairman, Nat'l Council on Disability, to Roger Severino, Director, Off. C.R., U.S. Dep't of Health and Human Servs. (Dec. 11, 2019), https://web.archive.org/web/20250523013336/https://www.ncd.gov/letters/2019-12-11-ncd-letter-to-hhs-on-assisted-suicide-medical-futility-and-qalys-reports/.

opportunity "that is not equal to that afforded others" or that is not as "effective in affording equal opportunity to … gain the same benefit … as that provided to others," in violation of 28 C.F.R. § 35.130(b)(1)(ii)-(iii); and (3) provides "different or separate aids, benefits, or services" to people with disabilities in a manner that does not "provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others" in violation of 28 C.F.R. § 35.130(b)(1)(iv).

>    **(2)    The Delaware Medical Board, Nursing Board, and their Presidents Deny People with Life-Threatening Disabilities the Medical and Nursing Licensing and Regulatory Protections Available to Others.**

107.    The U.S. Supreme Court recognizes that the State "has an interest in protecting the integrity and ethics of the medical profession."[48]  Defendants Medical Board, Medical Board President, Dr. Parise, Nursing Board, and Nursing Board President, APRN Mainwaring, are charged with protecting health care consumers through the proper licensing and regulation of providers through the vigorous, objective enforcement of the Medical Practice Act and Nurse Practice Act, as well as by ensuring quality medical care through licensing and regulatory functions.  By law, the highest priority of the Medical Board and Nursing Board in their regulatory and disciplinary functions is the protection of the public.  EOLOA, however, eliminates their patient protections for people with life-threatening disabilities.

108.    The Medical Board is charged with enforcing the disciplinary provisions of the Delaware Medical Practice Act, and as part of that role is charged with promulgating rules, making investigations, holding hearings, taking evidence, and reporting complaints of potentially criminal

---

[48] *Glucksberg*, 521 U.S. at 731 (citing American Medical Association, Code of Ethics § 2.211 (1994) ("[p]hysician-assisted suicide is fundamentally incompatible with the physician's role as healer.").

conduct to law enforcement. 24 *Del. C.* §§ 1713, 1731A(j). The Nursing Board is similarly charged with regard to the practice of nursing. 19 *Del. C.* § 1906.

109.    Under EOLOA, Plaintiffs and other individuals with life-threatening or "terminal" disabilities are denied the equal benefit of the Medical Board's and Nursing Boards' protections. The Act prohibits the Medical Board and Nursing Board from imposing any discipline on doctors and APRNs who prescribe lethal drugs under EOLOA, even though the provider knows that the patient is suicidal. 16 *Del. C.* § 2513C. Once the person is identified as having a life-threatening or "terminal" disability, the disciplinary safeguards provided by the Medical Practice Act and Nurse Practice Act are eliminated. *See id.*

**F. EOLOA Unlawfully Steers People with Life-Threatening Disabilities Toward Suicide.**

110.    EOLOA unlawfully and irrationally discriminates by steering people with life-threatening disabilities towards assisted suicide and all others towards life-preserving suicide prevention treatment services.

111.    Steering has the further effect of subjecting people with life-threatening disabilities to coercion and undue influence, depriving individuals of a truly voluntary and informed waiver of their right to live. Likely under the influence of depression and decreased decision-making capacity, a person evaluating assisted suicide may be highly influenced by others' opinions about whether they should go forward with the act. Insurers, hospitals, nursing homes, physicians, other healthcare providers, and even family members all have their own perspectives and unique, conflicting incentives that inevitably help shape the person's ultimate decision. People with life-threatening disabilities are particularly susceptible to undue influence from these stakeholders, who may directly or indirectly pressure them to obtain assisted suicide for the stakeholder's own convenience, financial gain, or other interests at odds with keeping the person alive.

112.    Most people in the elder community will experience a chronic disability or disease at the end of their lives and require extra care to safely remain in their homes.  But if that care is not made available and an individual's only alternatives to assisted suicide are waiting for a nursing home placement, burned-out or unavailable family care, or suffering in isolation, assisted suicide can become a seemingly preferable option.

113.    EOLOA presents a false choice between obtaining end-of-life care or assisted suicide.  The system is rigged to make assisted suicide the only viable option.  Life-sustaining treatment, long-term supportive services, in-home nursing services, palliative care, and hospice may be unavailable (or denied) due to a variety of reasons-including Defendants' system of setting health care priorities.  The Act does nothing to require that sufficient long-term care is available to the person, and/or exhausted or knowingly rejected, so that they can make an informed choice between assisted suicide and continuing to live with some semblance of independence.  Assisted suicide reduces pressure on Defendants to supply support services that enable people with life-threatening disabilities to make a meaningful choice between options that exist.  True autonomy presupposes having access to real options and being empowered to choose from among them.

114.    EOLOA extends personal "freedom" only to the decision to die by assisted suicide.  Defendants fail to ensure availability of any of the "feasible alternatives" the attending provider is supposed to review with the patient.  *See* 16 *Del. C.* § 2502C(10) ("An 'informed decision' is based on the individuals' appreciation of the relevant facts and is made after being fully informed by the attending physician or attending APRN of … the feasible alternative, concurrent, or additional treatment opportunities, including comfort care, hospice care, and pain control.").  Under the Act, there is no freedom to continue living in one's own home with adequate supportive

services, and no requirement that such services be offered or knowingly rejected as a less restrictive alternative to death.

115.    EOLOA purports to prohibit insurance steering.  It bars health insurers from using "an individual's act of making or rescinding a request for medication to end life" in the "sale, procurement, or issuance of a life, health, or accident insurance or annuity policy."  16 *Del. C.* § 2512C(2)(d).  It also specifies that utilizing EOLOA "does not invalidate any part of a life, health, or accident insurance or annuity policy."  16 *Del. C.* § 2512C(2)(e).  In addition, the Act states that an "insurer cannot deny or alter health-care benefits otherwise available to an individual with a terminal illness," based on whether an individual uses EOLOA.  16 *Del. C.* § 2512C(2)(f).

116.    Despite these provisions, the Act does nothing to ensure that insurers do not deny or delay approval of life saving or life extending therapies, supportive services and access to necessary assistive devices, while at the same time covering the costs of assisted suicide.  Direct coercion is not necessary where "patients are denied necessary life-sustaining health care treatment, or even if the treatment they need is delayed[;] many will, in effect, be steered toward assisted suicide."[49]

117.    Having one's own doctor or advanced practice nurse encourage or even agree with the choice to use assisted suicide is a powerful factor in support of that decision.[50]  Research has shown that doctors' own discomfort with people with life-threatening disabilities can influence the person's request to hasten death.  A study from Georgetown University's Center for Clinical Bioethics found a strong link between cost-cutting pressure on physicians and their willingness to

---

[49]  DREDF, *Why Assisted Suicide Must Not Be Legalized* section I(C)(1) (Oct. 12, 2012), https://archive.is/jA8yh.

[50]  *See*, *e.g.*, Steven H. Miles, *Physicians and Their Patients' Suicides*, 271 JAMA 1786 (1994).

prescribe lethal drugs to patients.[51]  For hospitals, nursing homes, hospices, and insurers, it is much less expensive to assist a person's suicide than it is to provide for care.

118.    Healthcare providers' subjective value judgments about their patient's quality of life also lead to recommendations of assisted suicide as a way to address perceived low-quality of life.  Some healthcare providers possess a "false empathy" towards their patients, believing that a person with a life-threatening disability is better off dead than alive without inquiring into the quality of life available with adequate supportive services or even the barriers to accessing supportive services.    Moreover, physicians often receive little training in quality-of-life interventions that can make continued life more desirable.[52]

119.    People who die by assisted suicide often cite the burden on family caregivers as a contributing factor.  Family members and other caregivers involved in decisions about assisted suicide have tremendous influence and can distort patient choice, based in part on their own anxiety, depression, and burnout from caring for a person with a life-threatening disability.  Family members who find it difficult to accept functional impairments in a loved one and/or are motivated by a desire to end perceived or actual suffering may—intentionally or unintentionally—convey the idea that the everyone would be better off if the patient were to accept assisted suicide.

120.    Some people who die by assisted suicide identify the financial implications of treatment as a reason for requesting lethal drugs.  The high cost of continuing medical care for people with cancer and other life-threatening disabilities can drain a family's savings, even with

---

[51] DREDF, *supra* n.42 (citing Daniel P. Sulmasy, *et al.*, *Physician resource use and willingness to participate in assisted suicide*, 158 JAMA INTERN. MED. 974, 978 (1998)).

[52] Nat'l Council on Disability, *The Danger of Assisted Suicide Laws* 10, 30-31 (Oct. 9, 2019), https://www.utas.edu.au/__data/assets/pdf_file/0003/1434054/Submission-18_Marion-Harris_-attachment-1.pdf.

insurance.[53]  People with life-threatening disabilities may experience overt pressure from family members concerned about mounting bills as well as their own internalized guilt that they will be incapable of leaving sufficient money or property to their next of kin-or worse, saddling them with unpaid healthcare costs.[54]

### G. EOLOA Draws an Irrational Distinction Between People with Life-Threatening Disabilities and Everyone Else.

#### (1)    There Is No Rational Basis for the Act's "Terminal Illness" Classification.

121.    The Act does not reasonably advance its claimed purposes of enabling autonomous choices in dying and relieving suffering.  EOLOA does not grant all Delawareans the freedom and liberty to die by assisted suicide, and there is no rational relationship in the Act between autonomy and certain physical disabilities with unreliable prognoses.  The only other justification proffered by the law's author is to ease suffering.

122.    But the fit between suffering and those with "terminal" disabilities is also poor.  For example, many non-terminal people suffer from pain but will be ineligible for assisted suicide under the Act.  Likewise, many non-terminal people fear losing autonomy, dignity, control of bodily functions, becoming a burden on caregivers, and/or the financial costs associated with continued living—but fall outside of EOLOA.  Those struggling with disabilities, however, come within the act—making the distinction irrational.

123.    Some people with life-threatening disabilities have impaired judgment and yet express a wish to die.  Their status is incompatible with autonomy and personal decision-making.

---

[53] John G. Cagle, *et al.*, *Financial burden among US households affected by cancer at the end of life*, 25 PSYCHO-ONCOLOGY 919 (2016), https://onlinelibrary.wiley.com/doi/abs/10.1002/apon.3933.

[54] Ezekiel J. Emanuel et al., *Understanding Economic and Other Burdens of Terminal Illness: The Experience of Patients and Their Caregivers*, 132 ANNALS INTERNAL MED. 451 (2000), https://www.acpjournals.org/doi/10.7326/0003-4819-132-6-200003210-00005.

When people with life-threatening disabilities are provided lethal drugs, there is a potential for exposing individuals to deadly mistakes and abuses. EOLOA fails to contain safeguards sufficient to justify treating people with life-threatening disabilities differently than others and, as discussed further herein, violates the rights of people with such disabilities to equal protection under the law.

> **(2)    EOLOA's Definition of "Terminal illness" is Arbitrary and Includes People with Life-Threatening Disabilities Who Can Live for Years with Adequate Treatments and Supports.**

124.    The six-month survival estimate embodied in EOLOA's definition of "terminal illness" is not rationally related to the Act's stated purposes. There is no connection between suffering and the six-month mark. Palliative care and pain control do not stop working six months before death. In addition, people without a terminal disease also can suffer from pain.

125.    Physicians and advance practice nurses are not trained, equipped, or otherwise capable of predicting with a high degree of reliability, that a particular person with a particular condition will likely die within six months. The overwhelming research and clinical information demonstrate that predictions of death six months out from the event are inherently unreliable, that physicians and advance practice nurses are not particularly good prognosticators, and that any such prediction is deeply tainted by impermissible stereotypes and discriminatory biases. A mistakenly grim prognosis may drive people to assisted suicide when they could otherwise live long lives with (or without) treatment. Spinal cord injury survivors are at times suicidal immediately following their initial injury and qualify as "terminal" because their injury will often result in death without surgery and/or supportive services—but they can and often do live long, happy lives. Individuals with anorexia or other eating disorders regularly recover and live long lives. So too with a myriad of disabilities, which, without treatment, rehabilitation, and/or long-term services and supports, are life-threatening, *i.e.*, "terminal" under the Act. Inaccurate end-of-life predictions are common

and dangerous when combined with biases present in the medical profession, and in society at large, that devalue disabled lives.

### H. EOLOA Unconstitutionally Deprives People with Life-Threatening Disabilities of Due Process Protections.

126.    EOLOA lacks sufficient safeguards and unconstitutionally deprives people with life-threatening disabilities of protections for their right to live.  The Act fails to ensure adequate due process for people who waive this constitutional right.  EOLOA fails to require the consideration, exhaustion, and/or knowing rejection of less restrictive, alternatives to assisted suicide.  The Act affirmatively places people with life-threatening disabilities in danger by acting with deliberate indifference to the known, obvious, and foreseeable dangers of making assisted suicide available to those with the highest risk factors for suicide.  Through their acts and omissions, Defendants fail to ensure that people who die by assisted suicide are provided their constitutional due process rights.

127.    EOLOA lacks safeguards to protect people from dying by suicide impulsively.  Risk for depression and suicidality is often present immediately after a traumatic injury or grave diagnosis, including a spinal injury.  A 2023 study of over 16 million people with cancer in the U.S. found that the "highest suicide risk occurred in the first 6 months after diagnosis, during which individuals diagnosed with cancer bore more than 7 times the suicide risk of the general population."[55]

128.    Despite this, EOLOA provides for a waiting period of only fifteen days.[56]  The likelihood that depression or another disorder that impairs judgment will resolve itself within

---

[55] Xin Hu, *et al.*, *Suicide Risk Among Individuals Diagnosed With Cancer in the US*, 2000-2016, 6 JAMA NETWORK OPEN 1, 9 (2023).

[56] 16 *Del. C.* § 2505C.

fifteen days is low.  If EOLOA goes into effect, Delawareans will be able to make an oral request to an attending provider; have their diagnosis, prognosis, and capacity confirmed by a second consulting provider (who does not have to meet with the patient in person); and fifteen days after the first request, ingest lethal drugs prescribed by the attending provider.  Such a short timeline cannot possibly provide the due process protections required when such a fundamental right—the right to live and exist in the world—is at stake.

129.    It is in part for these reasons that the American College of Physicians and the American Medical Association oppose physician-assisted suicide, stating that "Physician-assisted suicide is fundamentally incompatible with the physician's role as healer, would be difficult or impossible to control, and would pose serious societal risks."[57]  The purported safeguards are illusory, will be frequently disregarded, and/or will be circumvented in ways that harm and discriminate against people with life-threatening disabilities.  The newly enacted EOLOA system constitutes a State-created danger of death for persons considering suicide who could otherwise survive their immediate crisis and enjoy years of life.

**(1)    EOLOA's Vague Definition of "Terminal illness" Fails to Ensure an Adequate Process to Determine Assisted Suicide Eligibility.**

130.    The statutory definition of "terminal illness" is overbroad and encompasses the class of persons who have medical conditions that would result in death within six months without medical care but who can live for more than six months with medical care.  By leaving this key term vague and unclear, EOLOA fails to define the class of persons eligible for assisted suicide

---

[57] *See* Lois Snyder Sulmasy & Paul S. Mueller, *Ethics and the Legalization of Physician-Assisted Suicide: An American College of Physicians Position Paper*, 167 ANNALS INTERN. MED. 576 (2017), https://www.acpjournals.org/doi/full/10.7326/M17-0938.  On June 9, 2025, the American Medical Association reaffirmed its long-standing opposition to assisted suicide, https://patientsrightsaction.org/ama-reaffirms-opposition-to-assisted-suicide/.

with precision and fails to provide adequate guidance to the State's healthcare providers eligible to prescribe life-ending drugs under EOLOA as to how to determine whether a patient's condition meets the principal eligibility criteria. The category of people with "terminal illness" is inherently ambiguous and unstable.

131.    Providers are notoriously poor prognosticators regarding the timing of their patients' deaths. By failing to rely on any criteria or methodology to determine length of remaining life with any level of precision, and by failing to provide any guidance to the State's physicians and advance practice nurses as to how to determine whether a particular person's condition will or will not "result in death within six months" (with or without medical care), EOLOA will sweep in untold numbers of individuals whose conditions will (and do) not result in death within six months.

132.    The lack of clarity surrounding the process for determining who is eligible for State-sanctioned assisted suicide places individuals' lives at great risk from the unaccountable discretion and potential biases of individual doctors, and risks depriving individuals without decision-making capacity of the due process required by the U.S. Constitution.

**(2)     No Meaningful Mental Health Assessment or Treatment Is Required Under the Act.**

133.    EOLOA's lack of safeguards with respect to people with life-threatening disabilities, people who are already at a heightened risk of suicide, deprives people of life without due process of law.

134.    Depression plays an enormous role in assisted suicide deaths. Most people diagnosed as terminally ill who express a desire to die may be indirectly asking for help in dealing with the depression and accompanying concerns common to all people involved in challenging circumstances, particularly those persons nearing the end of their natural lives.

135.    Reduced decision-making capacity also plays an enormous role in deaths pursuant to EOLOA.  While the Act contains a requirement that the attending provider determine that the person has decision-making capacity, defined as the ability to understand and appreciate the nature and consequences of a particular health-care decision and to reach an informed health-care decision, "[m]any physicians receive no formal training in capacity assessment and may hold erroneous beliefs about decisional capacity."[58]  A study published in the American Journal of Geriatric Psychiatry in 2018 "revealed high rates of decisional impairment in terminally ill participants," and found that although "[m]ost terminally ill participants were able to express a treatment choice (85.7%), … impairment was common on the Understanding (44.2%), Appreciation (49.0%) and Reasoning (85.4%) subscales."[59]

136.    In suicide prevention, the standard of care when someone expresses suicidal ideation is to conduct a mental health evaluation to assess the risks, and then to provide treatment. However, the Act does not require psychiatrists and psychologists to be involved in decisions surrounding assisted suicide and data on assisted suicide collected from other states suggests that the opposite is often true.  Instead, the provider is required to refer the patient for a mental capacity assessment only if they "believe the individual may not have decision-making capacity"[60]—but the Act does not provide any standards to guide physicians and advance practice nurses in making these observations, nor does it require training in capacity assessment.

---

[58] Elissa Kolva, Barry Rosenfeld, & Rebecca Saracino, *Assessing the decision making capacity of terminally ill patients with cancer*, 26 AM J GERIATRIC PSYCHIATRY 5, 523-31 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6345171/.

[59] *Id.*

[60] 16 *Del. C.* § 2510C.

137.     Significantly, EOLOA assumes that a request for assisted suicide is not an indication of a mental disorder, when other Delaware laws make precisely the opposite assumption for virtually everyone else, and those laws require interventions up to and including involuntary hospitalization to test the assumption and diagnose the condition.  Even when a person is referred to a mental capacity assessment under EOLOA, the provider's inquiry is limited to determining whether the individual has "decision-making capacity" to use EOLOA.  16 *Del. C.* § 2510C.

138.     In a study of Oregon's assisted suicide law, more than half of psychiatrists surveyed reported that they were "not at all confident that they could, in the context of a single consultation, determine if a mental disorder or depression impaired the judgment of a person requesting assisted suicide."[61]

139.     EOLOA's procedures are insufficient for differentiating between people who have adequate decision-making capacity and those who do not.

**(3)     EOLOA Fails to Include Any Safeguards to Ensure that People Are Not Judgment-Impaired or Unduly Influenced at the Time of Death.**

140.     Once a prescription for assisted suicide drugs is provided to the patient, there are no requirements whatsoever in EOLOA to ensure that the necessary predicates for the provider prescribing the lethal medication remain true at a later time when the person may actually decide to ingest the medication: is the person under duress, capable of making medical decisions, suffering from a mental disorder that impairs judgment, still deemed to have a "terminal illness," and capable of understanding feasible alternatives?  Ingestion may occur days, weeks, months, or

---

[61] Linda Ganzini, *et al.*, *Evaluation of Competence to Consent to Assisted Suicide: Views of Forensic Psychiatrists*, 157 AM. J. PSYCHIATRY. 595, 595 (2000), https://ajp.psychiatryonline.org/doi/epdf/10.1176/appi.ajp.157.4.595.

even years after the request for assisted suicide was approved, during which a predicate's existence may have changed.

141.    There are no witness requirements at time of ingestion, no requirements that the attending provider be present or informed of the person's death, and no obligation to inform authorities of the true manner or cause of death.[62]  There are no requirements that the drugs be used within days, weeks, months, or years, and neither EOLOA nor Defendants do anything to ensure that the drugs are safely stored prior to consumption.  EOLOA requires that the medication be properly disposed of should the person not take the medication, but it contains no reporting requirements and takes no other steps to ensure that relevant parties comply with this requirement. This places the requestor and other people in the home—including children—at risk of suicide, misuse, or accidental ingestion of the drugs.

142.    The Act does not require any evidence that the person ingested the lethal drugs themselves, that is, whether the person self-administered the lethal drugs as required by the Act or whether anyone else (family member, nurse, provider, other medical provider, or friend) administered the medication or physically assisted the person.  Anything other than self-administration is a violation of the Act, but Defendants are not required to do anything to determine whether this critical line between suicide, active euthanasia, or even murder is ever crossed.

**(4)    EOLOA Fails to Provide Viable Alternatives to Suicide, Fails to Require Consideration or Exhaustion of Less Restrictive Alternatives to Suicide, and Lacks Independent Oversight.**

143.    EOLOA requires the attending provider to inform the patient of the "feasible alternative, concurrent, or additional treatment opportunities, including comfort care, hospice care,

---

[62] In fact, EOLOA requires that coroners misrepresent the cause of death and omit suicide.  The Act states that assisted suicide "does not, for any purpose, constitute elder abuse, suicide, assisted-suicide, homicide, or euthanasia."  16 *Del. C.* § 2512C.

and pain control" in order to ensure that the patient makes an "informed decision." 16 *Del. C.* § 2502C(10). But the Act includes no requirements or guidance regarding how in-depth or comprehensive this discussion must be, and Defendants fail to provide any. Upon information and belief, alternatives to assisted suicide will be routinely under-emphasized or not discussed in any meaningful way, and Defendants will fail to ensure that any of these alternatives are actually available.

144. EOLOA fails to require that people meaningfully consider, exhaust, and/or knowingly reject less restrictive, truly viable alternatives to assisted suicide, including suicide prevention services, palliative and/or hospice care, medical and nursing support services, and other personal support services that are ostensibly included among the "feasible alternatives" that Delaware providers are supposed to discuss with persons who seek assisted suicide. The Act fails to require the provision or exhaustion of the State's suicide prevention program, which is expressly designed to address the underlying concerns that drive people to suicidal thoughts and deter people from taking uninformed, untreated, or otherwise preventable suicidal actions.

### (5) Prescribing Providers Often Lack a Patient-Provider Relationship with the People for Whom They Prescribe Lethal Drugs.

145. EOLOA contains no safeguards to ensure that the provider who prescribes lethal drugs have any preexisting relationship with the patient or knowledge of their illness and treatment history. There is no requirement for the attending provider to request the patient's medical records before assisting their suicide. The attending and consulting providers need not even ever see the suicidal patient in person, as the Act does not prohibit providers from examining, evaluating, and prescribing lethal drugs to patients remotely, via telehealth consult.

146. EOLOA operates on the fiction that, on the basis of two visits, or even just phone calls, over fifteen days, a provider can: (1) make the "terminal" prognosis, (2) ensure the patient

is not acting under impaired judgment or duress, (3) decide whether to refer the patient for a mental health assessment, and (4) counsel the patient on their options and alternatives. The lack of an ongoing clinician-patient relationship requirement, moreover, facilitates provider-shopping, by which the patient seeks out a second provider, and in some cases, a third and a fourth "opinion," until one of them eventually agrees to write the prescription. Defendants are not required to track or restrict this practice, allowing easy evasion of the "safeguards" against duress, neglect, and abuse.

### (6) What Safeguards Exist Are Likely to Be Stripped From EOLOA After Enactment.

147. Across the United States and the globe, the enactment of assisted suicide laws has been followed by the methodical removal of statutory safeguards. Post-enactment amendments have eliminated requirements to meet with a physician in-person before choosing assisted suicide, shortened waiting periods to receive lethal drugs, lifted requirements that assisted suicide patients be residents of the state where they receive lethal drugs, allowed non-physicians to prescribe lethal drugs, and made patients whose natural deaths were not reasonably foreseeable eligible to die by assisted suicide. Such changes expedite the process of steering people with terminal disabilities toward death, rather than conforming to the standard of care for suicide prevention when they express a desire to kill themselves.

148. Canada offers a striking example of this trend. When Canada passed its assisted suicide statute in 2016, it included restrictive eligibility requirements. Assisted suicide was available only to mentally competent adult patients with a "serious and incurable illness, disease or disability" who were in an "advanced state of irreversible decline in capability" and who had "enduring physical or psychological suffering" that was "intolerable." Their natural deaths also

had to be "reasonably foreseeable."[63]  In 2021, Canada modified its statute, making patients whose deaths were not "reasonably foreseeable" eligible to die by assisted suicide.[64]  This change made Canadians with conditions as varied as quadriplegia, multiple sclerosis, blindness, and chronic back pain eligible to die by physician assisted suicide.[65]

149.    In March 2027, Canada will further expand eligibility to die by assisted suicide to patients whose sole underlying medical condition is a mental illness.[66]  A joint parliamentary committee on assisted suicide and euthanasia has also recommended to Canada's Parliament to make assisted suicide available to minors.[67]  With such expansions, it is often easier for patients to access physician assisted suicide than necessary medical and mental health care.[68]

150.    Within the U.S., post-enactment removal of assisted suicide statutes' safeguards also creates conditions where it is easier to get physician assistance to end one's life than to access supports to continue living.  In line with this trend, Vermont amended its assisted suicide law to remove the requirement that patients meet in-person with their physician before choosing assisted

---

[63] Canada Crim. Code, R.S.C., 1985, c. C-46, s. 241.1 (2016).

[64] Canada Crim. Code, R.S.C., 1985, c. C-46, s. 241.1 (2021).

[65] Katie Engelhart, *Five Things to Know About Assisted Dying in Canada*, N.Y. TIMES (June 1, 2025), https://www.nytimes.com/2025/06/01/magazine/medically-assisted-dying-canada-take aways.html.

[66] Health Canada, *The Government of Canada introduces legislation to delay Medical Assistance in Dying expansion by 3 years*, Gov. of Canada (Feb. 1, 2024), https://www.canada.ca/en/health-canada/news/2024/02/the-government-of-canada-introduces-legislation-to-delay-medical-assist ance-in-dying-expansion-by-3-years.html.

[67] Elaina Plott Calabro, *Canada is Killing Itself*, THE ATLANTIC, Aug. 11, 2025, at 28.

[68] *See, e.g.*, Kate Dubinski, *New report shows who is getting medical help with dying despite not being close to natural death*, Canadian Broad. Corp. (Oct. 28, 2024), https://www.cbc.ca/news/canada/london/new-report-shows-who-is-getting-medical-help-with-dying-despite-not-being-close-to-natural-death-1.7363801 (describing trends in assisted suicide patient population).

suicide.[69]  As in Delaware, Colorado has expanded the definition of "proscribing provider" beyond medical doctors, enabling non-M.D.s to prescribe lethal drugs.[70]  Oregon and Colorado have each amended their assisted suicide statutes to allow same-day dispensing of lethal drugs in some cases, while California has shortened waiting periods to 48 hours.[71]  Oregon and Vermont have also amended their assisted suicide statutes to allow non-residents to receive lethal prescriptions, making them destination states for assisted suicide.[72]

151.    The trend is clear—after assisted suicide laws are enacted, minimal safeguards which were used to justify the practice are eliminated to ensure that people with life-threatening disabilities are promptly provided the means to die rather than the standard of care for suicide prevention when they express a desire to kill themselves.

**I.    EOLOA Has a Direct Impact on Delawareans.**

152.    Plaintiffs are directly impacted by EOLOA.  As previously pled, each of the Plaintiffs are directly injured by the Act.  The harmful impact of the Act on Delawareans with life-threatening disabilities is profound.

153.    As noted, Plaintiff Sean Curran is a Delawarean with a life-threatening disability. He would be labeled as having a "terminal illness" by virtue of the Act, and the option to seek assisted suicide would be made immediately available to him.

---

[69] H. 190, 2023 Gen. Assem., Reg. Sess. (Vt. 2023).

[70] 2024 Colo. Legis. Serv. Ch. 406 (S.B. 24-068).

[71] *See* ORS 127.850 §3.08(2); Colo. Rev. Stat. Ann. § 25-48-104(1)(b); Cal. Health & Safety Code § 443.3(a) (effective June 9, 2016, Amended by Stats. 2021, Ch. 542, Sec. 2. (SB 380) Effective January 1, 2022).

[72] *See* H.B. 2279, 82nd Legis. Assem., Reg. Sess. (Or. 2023); H. 190, 2023 Gen. Assem., Reg. Sess. (Vt. 2023).

154.    Throughout Mr. Curran's life, he has had challenges because he is a quadriplegic. He needs help with the most basic of needs, including, but not limited to, eating, drinking and toileting.  This past year and a half, he developed a bowel obstruction which kept him hospitalized for several months.  During this period, he experienced some of his darkest moments, even losing the desire to live.  If the Act had been in effect, it would have been very easy for him to choose assisted suicide.

155.    Delaware ADAPT's Organizer, Daniese McMullin-Powell, who resides in Delaware, is herself disabled.  She is a polio survivor.  She has not been able to walk unassisted since she was three-years old, and she has been a wheelchair user since her early 20s.  She is currently 79 years old and struggles with chronic pain.  For a number of years, she was assisted with her day-to-day routines by her husband.  However, last year, her husband suffered from a stroke that left him incapable of assisting her.  She has now had to take on the role of being the caregiver to her husband in addition to caring for herself.

156.    Ms. McMullin-Powell, like many other members of Delaware ADAPT, has suffered from discrimination based on her disabilities.  Sometimes this discrimination is unintentional—expressed through careless comments made by people she knows.  She has had people who have known her since her youth tell her, "I am surprised you are still alive," or "I would have killed myself if I were in your position."  She has had medical providers suggest that she should not pursue certain treatments because it would not make much difference to a person like her with a disability.

157.    As Ms. McMullin-Powell notes, this discrimination is all too prevalent in the medical profession.  She has had to fight for services to be provided to her, often resulting in lengthy wait times and frustrations.  In her darkest moments, she has considered suicide as a means

to end the frustrations and pain that she experiences due to her disability, but has ultimately found the strength to move forward.

158.    EOLOA poses a real threat to Delaware ADAPT's members—people like Ms. McMullin-Powell.  By labeling persons with life-threatening disabilities as having a "terminal illness," the Act puts Delaware ADAPT's constituent members in harm's way.  This makes physician assisted suicide readily available to Delaware ADAPT's members.  The Act fosters further discrimination against Delawareans with disabilities.

159.    FCIL and the "consumers" that FCIL assists every day have deep concerns regarding the impact of the Act.  FCIL assists people with life-threatening disabilities who would be labeled as having a "terminal illness" by virtue of the Act.  FCIL has legitimate concerns that this will lead to further discrimination that its consumers face every day as persons with disabilities.

160.    The Act makes it far too easy to suggest an alternative pathway for persons with disabilities, namely physician assisted suicide.  FCIL has consumers who struggle to obtain the medical devices that they need to remain in their own homes, facing long delays for basic needs.  The Act makes it easy to obtain a lethal prescription to end one's life.  FCIL has serious concerns that certain of our consumers will be directed toward physician assisted suicide as a reasonable alternative to facing the day-to-day challenges that come with living with a disability.  FCIL's leadership is personally aware of certain FCIL consumers who have considered suicide as a way to respond to the difficulty of securing adequate care and support.

161.    The Act represents a true threat to the people for whom IPR advocates.  So much of IPR's effort is expended to end policy and medical practice that devalues some people to death, most of which amounts to deadly discrimination against people with disabilities.  The Act

has created a two-tiered system, wherein some people get suicide assistance, namely people with life-threatening disabilities who under EOLOA are labeled "terminal" (whether they are or are not), while everyone else gets the standard of care—suicide prevention.

162.    Plaintiff IPR maintains that there are systemic barriers to access and pervasive biases against people with disabilities and other historically underrepresented groups.  EOLOA makes assisted suicide readily available to those persons, essentially funneling them to suicide.  While proponents of EOLOA claim that the Act will provide for more autonomy, the realities are that the Act is more akin to eugenics—offering death to a devalued group.  Again and again, IPR has heard from those on whose behalf they advocate that assisted suicide laws intensifies discrimination against those with disabilities.

163.    Recently, IPR leadership heard from two Delawareans with disabilities, both women of color, concerning the Act.  One said that she is concerned that when the law goes into effect, medical professionals may offer assisted suicide to her in a dark moment when she's most vulnerable.  The other expressed concern that EOLOA "exacerbates and expedites biases.  They essentially have my life in their hands, and they devalue my life."  She expressed concern that proponents will "persuade her to go the assisted suicide route."

164.    Each of the other Plaintiff organizations has stories similar to these concerning their constituent members.

### CAUSES OF ACTION

### COUNT I
**Violation of Americans with Disabilities Act, 42 U.S.C. §§ 12132, 12203**
**(Against All Defendants)**

165.    Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination."  42 U.S.C. § 12132.

A "public entity" includes State and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1).

166.    Defendants are public entities and/or officers of public entities within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.  Defendants provide suicide prevention services and regulation of the medical profession in Delaware.  Suicide prevention services are programs, services, and activities within the meaning of the ADA.  The Medical Board's regulation of the medical profession and enforcement of rules and laws applicable to medical professionals are also programs, services, and activities within the meaning of the ADA.

167.    The ADA defines "a qualified individual with a disability" as a person who has a "physical or mental impairment that substantially limits one or more major life activities," including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. §§ 12102(1)(A), (2)(A), 12131(2).  The ADA Amendments Act of 2008 clarified the definition of "major life activities" to also include: "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."  42 U.S.C. § 12102(2)(B).  "The definition of 'disability' … shall be construed in favor of broad coverage … to the maximum extent permitted by the terms of [the ADA]."  42 U.S.C. § 12102(4)(A).

168.    Plaintiff Curran is a qualified individual, and Plaintiff organizations have members or constituents who are qualified individuals, with disabilities as defined in the ADA and ADA Amendments Act of 2008.  Plaintiffs are qualified because they are or represent people with life-threatening disabilities who both will qualify to use EOLOA's procedures to end their lives and to

use Defendants' suicide prevention services.  Under EOLOA, "terminal illness" means "an incurable and irreversible disease, illness, or condition that as a medical probability, will result in death within 6 months."  16 *Del. C.* § 2502C(17).

169.    People, such as Plaintiff Curran, with spinal cord injuries who will qualify to use EOLOA all have disabilities within the meaning of the ADA and Section 504 of the Rehabilitation Act.  All spinal cord injuries that arguably satisfy the definition of "terminal illness" under EOLOA are also disabilities under the ADA and Section 504 because they are mental or physical impairments that substantially limit major life activities of walking, standing, lifting, bending, and/or caring for oneself.  *See* 42 U.S.C. § 12102(2)(A).  Plaintiffs are therefore entitled to the protections of the ADA.

170.    Through administering EOLOA, Defendants exclude persons with life-threatening disabilities, including but not limited to people with spinal cord injuries, from participation in and deny them the benefits of Delaware's suicide prevention services, programs, and activities and the benefits of the programs, services, or activities of the Delaware Board of Medical Licensure and Discipline's and Delaware Board of Nursing's regulation of the medical profession and enforcement of laws applicable to medical professionals.  Such exclusion and denial of benefits constitute discrimination based on disability in violation of 42 U.S.C. § 12132.

171.    Congress directed the Department of Justice to promulgate regulations to implement Title II's anti-discrimination provisions.  42 U.S.C. § 12134.  The regulations provide further clarity regarding what it means to exclude a person from participation in and/or deny a person the benefits of a program, service, or activity.  Such denial and exclusion can take the form of affording persons with disabilities with services that are not equal to those provided to others,

28 C.F.R. § 35.130(b)(1)(ii), or are less effective, *id.* § 35.130(b)(1)(iii), or that are separate unless such separation is necessary to provide an equally effective service, *id.* § 35.130(b)(1)(iv).

172.   EOLOA operates in all these forms to harm persons with life-threatening disabilities.  EOLOA's rapid pathway to death is a separate, unequal, and less effective way of responding to suicidality, compared with Delaware's ordinary suicide prevention programs. EOLOA channels persons with life-threatening disabilities into this separate, unequal, and less effective way of responding to suicidality, hastening deaths that could be avoided for decades, as well as diverting persons from necessary palliative care at the very end of their lives.

173.   Furthermore, by carving out physician and advance practice nurse participation in EOLOA from requirements that otherwise apply to physicians and advance practice nurses responding to suicidal patients and by failing to investigate any physicians or advance practice nurses for violating EOLOA, Defendants deny people with life-threatening disabilities the benefits of Defendants' programs, services, and activities of regulation of the medical profession and quality of medical care.  Accordingly, Defendants exclude Plaintiffs from participation in, and deny them the benefits of, or otherwise discriminate against them in, Defendants' suicide prevention programs and services in violation of the ADA.

174.   Plaintiffs have no adequate remedy at law, and unless the relief herein is granted, Plaintiff Curran and Plaintiff organizations' members will suffer irreparable harm in that they will be discriminated against, denied equal access to the suicide prevention programs and services operated and overseen by Defendants, and die an unnatural, premature death by suicide. Consequently, Plaintiffs are entitled to injunctive relief and attorneys' fees pursuant to 42 U.S.C. §§ 12101 and 12205.

175.    Plaintiffs seek both declaratory relief that EOLOA violates the Americans with Disabilities Act, 42 U.S.C. §§ 12132 and 1220, and preliminary and permanent injunctive relief barring enforcement of EOLOA.

**COUNT II**
**Violation of Rehabilitation Act, 29 U.S.C. § 794**
**(Against All Defendants)**

176.    Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

177.    Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Section 504 is interpreted similarly to the ADA and applies to any entity that receives federal funds.

178.    At all times relevant to this action, Defendants are and have been recipients of federal financial assistance within the meaning of the Rehabilitation Act.

179.    An "individual with a disability" is defined under the statute, in pertinent part, as "an individual [who has] a physical or mental impairment that substantially limits one or more major life activities of such individual." 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12102). "Qualified" means, with respect to services, a person who meets the essential eligibility requirements for the receipt of such services. 28 C.F.R. § 41.32.

180.    Plaintiff Curran is a qualified individual, and Plaintiff organizations have members or constituents who are qualified individuals, with disabilities as defined in Section 504 as they have disabilities that substantially limit one or more major life activities and will meet the essential eligibility requirements of both EOLOA and Defendants' suicide prevention services. All

conditions that arguably satisfy the definition of "terminal illness" under EOLOA, including but not limited to serious eating disorders and spinal cord injuries, are also disabilities under Section 504 because they are mental or physical impairments that substantially limit major life activities. *See* 42 U.S.C. § 12102(2).

181.    Section 504 defines "program or activity," in relevant part, as "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government."  29 U.S.C. § 794(b)(1).

182.    Defendants' suicide prevention services in Delaware are programs or activities within the meaning of Section 504 of the Rehabilitation Act and must comply with Section 504's antidiscrimination requirements.  The Delaware Medical Board's and Nursing Board's regulation of the medical and nursing professions and enforcement of rules and laws applicable to medical and nursing professionals are programs, services, or activities within the meaning of Section 504 of the Rehabilitation Act.

183.    The U.S. Department of Health and Human Services has issued regulations implementing Section 504 of the Rehabilitation Act applicable to medical care.  These regulations prohibit discrimination on the basis of disability in medical treatment. 45 C.F.R. § 84.56(a).  These regulations specifically prohibit covered entities from "[providing] a medical treatment to an individual with a disability where it would not provide the same treatment to an individual without a disability, unless the disability impacts the effectiveness, or ease of administration of the treatment itself, or has a medical effect on the condition to which the treatment is directed."  *Id.*

§ 84.56(b)(3).  This prohibition applies to offers to provide treatment as well as to instances where treatment is actually provided.  Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance, 89 F.R. 40066, 40083 ("§84.56(a)'s prohibition on discrimination on the basis of disability can encompass instances where a recipient offers [...] treatment.").

184.    Defendants violate HHS's regulations implementing Section 504 by offering purported medical "treatment"—assisted suicide—to people with life-threatening disabilities on the basis of disability, that they do not offer to others.  None of the exceptions to the prohibition on offering medical treatment to only people with disabilities apply to the provision of assisted suicide to people with life-threatening disabilities.  Life-threatening disabilities do not impact "the effectiveness" of assisted suicide drugs, and such disabilities do not make it easier to administer assisted suicide drugs.  "Terminal" or life-threatening disabilities also do not have "a medical effect on the condition to which" assisted suicide drugs are "directed" because assisted suicide drugs are not directed at treating any specific conditions.  These drugs are instead directed at terminating life.

185.    The United States DOJ is charged under Executive Order 12250 with coordinating the implementation of Section 504.  28 C.F.R. § 41.1.  Pursuant to this mandate, the DOJ has also issued regulations defining forms of discrimination prohibited by Section 504.  The regulations prohibit schemes that offer aids, benefits, or services to people with disabilities that are "not equal to that afforded others," 28 C.F.R. § 41.51(b)(1)(ii), not as effective as those afforded to others, *id.* § 41.51(b)(1)(iii), that are "different or separate" from those provided to others unless the separateness is necessary to provide equally effective services, *id.* at § 41.51(b)(1)(iv), that limit a person's enjoyment of rights, privileges, advantages or opportunities enjoyed by others, *id.* at

§ 41.51(b)(1)(vii), that are administered through criteria or methods that have the effect of discriminating on the basis of disability, *id.* at § 41.51(b)(3)(i).  EOLOA operates in all of these forms to harm persons with life-threatening disabilities.  EOLOA's rapid pathway to death is a separate, unequal and less effective way of responding to suicidality, compared with Delaware's ordinary suicide prevention programs.  EOLOA channels persons with life-threatening disabilities into this separate, unequal and less effective way of responding to suicidality, hastening deaths that could be avoided for months, years, or even decades, as well as diverting persons from necessary palliative care at the very end of their lives.

186.    Defendants thus exclude Plaintiffs from participation in, and deny them the benefits of, or otherwise discriminate against them in, Defendants' suicide prevention programs and activities in violation of Section 504 of the Rehabilitation Act.

187.    Furthermore, by carving out physician participation in EOLOA from requirements that otherwise apply to physicians and advance practice nurses responding to suicidal patients, Defendants deny people with life-threatening disabilities the benefits of Defendants' programs, services, and activities of regulation of the medical profession and quality of medical care in violation of Section 504 of the Rehabilitation Act.

188.    Plaintiffs have no adequate remedy at law, and unless the relief herein is granted, Plaintiff Curran and Plaintiff organizations' constituents and members will suffer irreparable harm in that they will be discriminated against and denied equal access to the program or activity operated and overseen by Defendants.  Consequently, Plaintiffs are entitled to injunctive relief and attorneys' fees pursuant to 29 U.S.C. § 794(a).

189.    Plaintiffs seek both declaratory relief that EOLOA violates the Rehabilitation Act, 29 U.S.C. § 794, and preliminary and permanent injunctive relief barring enforcement of EOLOA.

<u>COUNT III</u>
**Violation of Affordable Care Act Section 1557, 42 U.S.C. § 18116**
**(Against All Defendants)**

190.    Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

191.    Section 1557 of the Affordable Care Act provides that "an individual shall not, on the ground prohibited under … section 794 of title 29 [Section 504 of the Rehabilitation Act], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection."  42 U.S.C. § 18116(a).

192.    Defendants operate health programs or activities receiving federal financial assistance for purposes of Section 1557.  Such health programs or activities include but are not limited to health programs or activities operated by Defendants DHSS, including chronic disease prevention; general promotion of health and wellness; health facilities licensure and certification; consumer protection; and suicide prevention, among other activities, and—once in effect—the collection and review of documents submitted by providers under EOLOA, the regulation and control of the healing arts performed by Defendants Medical Board and Nursing Board, and the suicide prevention programs operated by the Office of Suicide Prevention within Defendant DHSS.

193.    An "individual with a disability" is defined under the statute, in pertinent part, as "an individual [who has] a physical or mental impairment that substantially limits one or more major life activities of such individual." 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12102). "Qualified" means, with respect to services, a person who meets the essential eligibility requirements for the receipt of such services. 28 C.F.R. § 41.32.

194.    Plaintiff Curran is a qualified individual, and Plaintiff organizations have members or constituents who are qualified individuals, with disabilities as defined in Section 504, as set forth above, they are also qualified individuals with disabilities under Section of the ACA.

195.    Defendants' suicide prevention services in Delaware are health programs or activities within the meaning of Section 1557 of the ACA and must comply with Section 1557's antidiscrimination requirements. The Medical Board's and Nursing Board's regulation of the medical and nursing profession and enforcement of rules and laws applicable to medical and nursing professionals are programs, are health programs or activities within the meaning of Section 1557 of the ACA.

196.    Defendants violate Section 1557 of the ACA by offering purported medical "treatment"—assisted suicide—to people with life-threatening disabilities on the basis of disability, that they do not offer to others. EOLOA's rapid pathway to death is a separate, unequal, and less effective way of responding to suicidality, compared with Delaware's ordinary suicide prevention programs and hastens deaths that could be avoided for months, years, or even decades.

197.    Defendants thus exclude Plaintiffs from participation in, and deny them the benefits of, or otherwise discriminate against them in, Defendants' suicide prevention programs and activities in violation of Section 1557 of the ACA.

198.    Furthermore, by carving out participation in EOLOA from requirements that otherwise apply to physicians and advance practice nurses responding to suicidal patients, Defendants deny people with life-threatening disabilities the benefits of Defendants' health programs and activities of regulation of the medical profession and quality of medical care in violation of Section 1557 of the ACA.

199.    Plaintiffs have no adequate remedy at law, and unless the relief herein is granted, Plaintiffs and their members will suffer irreparable harm in that they will be discriminated against and denied equal access to the program or activity operated and overseen by Defendants. Consequently, Plaintiffs are entitled to injunctive relief and attorneys' fees pursuant to Section 1557 of the ACA.

200.    Plaintiffs seek both declaratory relief that EOLOA violates Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, and preliminary and permanent injunctive relief barring enforcement of EOLOA.

**<u>COUNT IV</u>**
**Violation of the 14th Amendment Equal Protection, 42 U.S.C. § 1983**
**(Against All Individual Defendants in Their Official Capacities)**

201.    Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

202.    The Equal Protection Clause of the Fourteenth Amendment provides that no State may deny any person within its jurisdiction the equal protection of the laws.

203.    EOLOA is unconstitutional because it treats people with life-threatening disabilities on unequal terms with similarly situated people without a rational basis or compelling interest.

204.    EOLOA discriminates against those with life-threatening disabilities, denying protections and safeguards, without any rational basis. This undermines and interferes with the

State's interest in suicide prevention by sanctioning the act of helping someone else kill themselves based on arbitrary designations applied inconsistently. There is no compelling or even rational basis to treat the lives of people with life-threatening disabilities any different from other groups of people ineligible to participate in EOLOA who nevertheless share similar concerns as those with such disabilities. However, under the application of EOLOA as enacted, those without life-threatening disabilities are not counseled to, and assisted with, killing themselves, but those with such disabilities are.

205.    Further, terminal diagnoses are inherently uncertain. Those with life-threatening disabilities, deemed "terminal" under the Act, can make full recoveries, heightening the uncertainty of a terminal diagnosis.

206.    Because EOLOA implicates a fundamental right-the right to live-the discrimination warrants a heightened level of review.

207.    Plaintiffs have no adequate remedy at law, and unless the relief herein is granted, Plaintiff Curran and Plaintiff organizations' constituents and members will suffer irreparable harm in that they will be discriminated against through the application of EOLOA by Defendants. Consequently, Plaintiffs are entitled to injunctive relief and attorneys' fees pursuant to 42 U.S.C. § 1983.

208.    Plaintiffs seek both declaratory relief that EOLOA violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution and that EOLOA is unconstitutional, and preliminary and permanent injunctive relief barring enforcement of EOLOA, together with attorneys' fees.

<u>**COUNT V**</u>
**Violation of 14th Amendment Due Process, 42 U.S.C. § 1983, and**
**Article I, Section 7 of the Delaware State Constitution of 1897 (as amended)**
**(Against All Individual Defendants in Their Official Capacities)**

209.    Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

210.    The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution provides that no State shall deprive any person of life, liberty, or property without due process of law.

211.    Article I, Section 7 of the Delaware State Constitution also provide that no person "shall … be deprived of life, liberty or property, unless by the judgment of his or her peers or by the law of the land."

212.    **Substantive Due Process:**    Plaintiff Curran and Plaintiff organizations' constituents and/or members have a fundamental right under the Due Process Clause and the Delaware State Constitution to protections and security for their right to live, and this fundamental right cannot be waived without due process.  This fundamental right of protection of life is grounded in the nation's history and legal traditions, which have punished or otherwise disapproved of assisting suicide and generally rendered such assistance a crime.

213.    The U.S. Supreme Court recognized in *Washington v. Glucksberg*, 521 U.S. 702, 732 (1997), that assisted suicide laws pose a "risk of harm [that] is greatest for the many individuals in our society whose autonomy and well-being are already compromised by poverty, lack of access to good medical care, advanced age, or membership in a stigmatized social group."  The Supreme Court grounded this traditional protection against assisted suicide in "over 700 years" of common law tradition.  *Id.* at 711-18.

214.    EOLOA violates the Due Process Clause and the Delaware State Constitution's Due Process Clause by denying the fundamental interest in the preservation of life to individuals whose doctors diagnose them with life-threatening disabilities and prescribe lethal drugs on that basis.

215.    Here, Plaintiffs do not assert a substantive due process right to state-provided suicide prevention.  To the contrary, Plaintiffs assert a right to be free from a state-created system that increases the risk of death by suicide through the licensing of medical providers to prescribe lethal medications under a system that withdraws all of the protections that the state normally provides against dangerous medical practices.

216.    By enacting and enforcing EOLOA, the Defendants have and will create a danger of state-endorsed suicide by lethal drugs, targeted specifically at the groups of persons with life-threatening disabilities represented by Plaintiffs, putting Plaintiff Curran and Plaintiff organizations' constituents and members at substantial risk of serious, immediate, and proximate harm.  Defendants have acted recklessly and with conscious disregard of the risks of harm created by the newly enacted EOLOA system of State-endorsed medical suicide, in a manner that shocks the conscience.

217.    **Procedural Due Process**: Defendants also violate the Due Process Clause, as elucidated by the U.S. Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976), and *Goldberg v. Kelly*, 397 U.S. 254 (1970), and the Due Process Clause of the Delaware State Constitution by failing to include in EOLOA sufficient safeguards to prevent even the deaths that EOLOA purports to prevent—those caused by impaired judgment, depression, coercion, undue influence, or fear of medical impoverishment.  Procedural due process considers how much process must be afforded depending on the extent of grievous loss to be suffered and whether the interest in avoiding that

loss outweighs the governmental interest. *Goldberg*, 397 U.S. at 262-63. *See also* Art. I, § 7 of Delaware State Constitution (providing that persons shall not "be deprived of life, liberty or property, *unless by the judgment of his or her peers or by the law of the land*.") (emphasis added).

218.    Here, the private interest is avoidance of suicide caused by impaired judgment, depression, coercion, undue influence, or fear of medical impoverishment. Such suicides would be "erroneous" under the EOLOA framework for purposes of due process. Defendants violate procedural due process because EOLOA does not do enough to prevent erroneous suicides by: (1) allowing a patient to make a request to kill themselves fifteen days in advance; (2) allowing the determination of eligibility to be made by a non-physician; (3) allowing the consulting provider that confirms eligibility to also be a non-physician; (4) not requiring a mental health evaluation, despite the strong nexus between life-threatening disabilities, eating disorders, and spinal cord injuries, on the one hand, and depression and suicidality on the other; (5) not making clear whether the prognosis of six months or less takes into account alternative treatment options given that life expectancy prognoses for people with "terminal" disabilities can be inaccurate, for example given that eating disorders are fully treatable, and, with medical treatment, physical therapy, mobility aids, and other supports, people with spinal cord injuries can live long lives and obtain substantial independence and autonomy; (6) requiring a provider to "discuss" alternative options, but not requiring them, the insurer, or the State to make any available to the patient; and (7) not requiring any oversight at the time of ingestion that would confirm whether the patient was coerced, suffering from impaired judgment at the time of ingestion, or whether the patient was even still eligible at the time of ingestion, given the unreliability of life expectancy prognoses.

219.    Plaintiffs have no adequate remedy at law, and unless the relief herein is granted, Plaintiff Curran and Plaintiff organizations' constituents and members will suffer irreparable harm

in that they will continue to be deprived due process by Defendants. Consequently, Plaintiffs are entitled to injunctive relief and attorneys' fees pursuant to 42 U.S.C. § 1983.

220.    Plaintiffs seek both declaratory relief that EOLOA violates the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution and Article I, Section 7 of the Delaware State Constitution and that EOLOA is unconstitutional, and preliminary and permanent injunctive relief barring enforcement of EOLOA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against all Defendants and each of them, as follows:

A.  Declaring that EOLOA violates Title II of the Americans with Disabilities Act on its face and as applied to people with life-threatening disabilities generally;

B.  Declaring that EOLOA violates Section 504 of the Rehabilitation Act on its face and as applied to people with life-threatening disabilities generally;

C.  Declaring that EOLOA violates Section 1557 of the Affordable Care Act on its face and as applied to people with life-threatening disabilities generally;

D.  Declaring EOLOA unconstitutional under the Fourteenth Amendment's Equal Protection Clause on its face and as applied to people with life-threatening disabilities generally;

E.  Declaring EOLOA unconstitutional under the Fourteenth Amendment's Due Process Clause and Article I, Section 7 of the Delaware State Constitution on its face and as applied to people with life-threatening disabilities generally;

F.  Preliminarily and permanently enjoining Defendants from enforcing EOLOA; and

G.  Granting such other and further relief as this Court may deem just and proper, including an award to Plaintiffs of the costs of this suit and reasonable attorneys' fees and litigation expenses.

Dated:  December 8, 2025

**HALLORAN FARKAS + KITTILA LLP**

**Of Counsel:**

*/s/ Theodore A. Kittila*

Theodore A. Kittila (Bar No. 3963)
William E. Green, Jr. (Bar No. 4864)
5722 Kennett Pike
Wilmington, Delaware 19807
Phone:  (302) 257-2025
Fax:  (302) 257-2019
Email:  tk@hfk.law | wg@hfk.law

Ernest Galvan*
Michael Bien*
**ROSEN BIEN GALVAN & GRUNFELD LLP**
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Phone:  (415) 433-6830
Fax:  (415) 433-7104
Email:  egalvan@rbgg.com | mbien@rbgg.com

*Counsel for Plaintiffs*

*Motions *pro hac vice* forthcoming