# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SEAN CURRAN, *et al.*,

                Plaintiffs,

        v.

THE HONORABLE MATTHEW MEYER, in
his official capacity as Governor of the State of
Delaware, *et al.*,

                Defendants.

Civil Action No. 25-1475-GBW

---

Theodore A. Kittila, William E. Green, Jr., HALLORAN FARKAS + KITTILA LLP, Wilmington, Delaware; Ernest J. Galvan, Michael W. Bien, ROSEN BIEN GALVAN & GRUNFELD LLP, San Francisco, California.

        *Counsel for Plaintiffs*

Patricia A. Davis, Lynn A. Kelly, Victoria R. Sweeney, Delaware Department of Justice, Wilmington, Delaware.

        *Counsel for Defendants*

## MEMORANDUM OPINION

December 30, 2025
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

On December 8, 2025, Plaintiffs Sean Curran ("Mr. Curran" or "Individual Plaintiff"), Delaware ADAPT ("ADAPT"), Freedom Center for Independent Living ("FCIL"), United Spinal Association ("United Spinal"), National Council on Independent Living ("NCIL"), Not Dead Yet ("NDY"), and Institute For Patients' Rights ("IPR") (together with ADAPT, FCIL, United Spinal, NCIL, and NDY, "Organizational Plaintiffs") (collectively, "Plaintiffs") brought this action against Defendants Governor Matthew Meyer ("Governor Meyer"), in his official capacity as Governor of the State of Delaware; the Delaware Department of Health and Social Services ("DHSS"); Secretary Christen Linke Young ("Secretary Young"), in her official capacity as Secretary of the DHSS; the Delaware Board of Medical Licensure and Discipline ("DBMLD"); Joseph Parise ("Dr. Parise"), in his official capacity as President of the DBMLD; the Delaware Board of Nursing ("DBN"); and Jacqueline Mainwaring ("APRN Mainwaring"), in her official capacity as President of the DBN (collectively, "Defendants"), seeking to enjoin Defendants from the implementation and enforcement of Delaware's End of Life Options Act, 16 Del. C. § 2501C, *et seq* ("EOLOA"). D.I. 1; D.I. 3.

On December 8, 2025, Plaintiffs also filed their Motion for a Temporary Restraining Order ("TRO Motion"). D.I. 3. On December 18, 2025, Defendants filed an answering brief challenging both the merits of Plaintiffs' grounds for a TRO and whether Plaintiffs have standing under Article III of the U.S. Constitution. D.I. 37. On December 23, 2025, Plaintiffs filed their reply brief. D.I. 50. Meanwhile, on December 19, 2025, Susan Boyce, Vickie George, and Compassion & Choices

Action Network filed a Motion to Intervene as Defendants and Defer Response to the Complaint ("Motion to Intervene"). D.I. 38.

As explained in more detail below, the Court holds that Plaintiffs lack standing to bring this action. Thus, the Court dismisses this action for lack of jurisdiction. Moreover, even if there were standing, the Court finds that Plaintiffs' TRO Motion (D.I. 3) fails on the merits and is denied. The Court also denies as moot the Motion to Intervene (D.I. 38).

## I.    BACKGROUND

### A.    Delaware's End of Life Options Act ("EOLOA")

Under Delaware's EOLOA, "[a] terminally-ill-adult individual who has decision-making capacity has the right to request and self-administer medication to end their life in a humane and dignified manner." 16 Del. C. § 2501C(a). For purposes of Delaware's EOLOA, a "terminal illness" refers to "an incurable and irreversible disease, illness, or condition that as a medical probability, will result in death within 6 months." 16 Del. C. § 2502C(17). Delaware's EOLOA expressly limits the right to access life-ending medication to "qualified individuals."[1]

Section 2505C sets forth the procedure that an individual must follow to qualify. In general, the individual must make two oral requests and one written request to their attending physician or APRN. 16 Del. C. § 2505C(a). Delaware's EOLOA sets forth mandatory waiting periods: first, the individual seeking life-ending medication may make the second oral request "no fewer than 15 days after making the first oral request," 16 Del. C. § 2505C(b); second, the

---

[1] To be a qualified individual, the individual must be an adult resident of Delaware, their attending physician (or Advanced practice registered nurse ("APRN") must have completed the requirements of Section 2508C, their consulting physician or APRN must have completed the requirements of Section 2509C, and the individual must have "made an informed decision to voluntarily request medication to end their life in a humane and dignified manner" under Section 2505C. 16 Del. C. § 2504C(a).

3

attending physician "may not write a prescription under this chapter less than 48 hours after the individual's written request for medication to end life in a humane and dignified manner." 16 Del. C. § 2507C(b). During the second oral request, the attending physician or APRN "must offer the individual an additional opportunity to rescind [the] request." 16 Del. C. § 2505C(b). Finally, the individual's written request[2] must contain the following: (1) a request for the medication; (2) the individual's signature, dated; and (3) the signatures of two adult witnesses that attest that they (a) signed in the individual's presence, and (b) the individual "has decision-making capacity, is acting voluntarily, and is not being coerced to sign the document." 16 Del. C. § 2505C(c). In addition, [n]o more than 1 of the witnesses . . . may be any of the following:

---

[2] Delaware's EOLOA provides a form, replicated below:

**Request for Medication to End My Life in a Humane and Dignified Manner**

I, _____, am an adult resident of Delaware with decision-making capacity.

I have been diagnosed with _____, which my attending physician or attending APRN has determined is a terminal illness and has been medically confirmed by a consulting physician or consulting APRN. I have been fully informed of my diagnosis and prognosis of 6 months or less to live, the nature of the medication to be prescribed to end life in a humane and dignified manner, the potential associated risks of this medication, the expected result, and the feasible alternative, concurrent, or additional treatment opportunities available to me, including comfort care, palliative care, hospice care, and pain control.

I request that my attending physician or attending APRN prescribe medication to end life in a humane and dignified manner that will end my life in a peaceful manner if I choose to take it, and I authorize my attending physician or attending APRN to dispense my prescription or to contact a pharmacist to dispense my prescription. I understand that I have the right to rescind this request at any time. I understand the seriousness of this request, and I expect to die if I take the medication prescribed to end life in a humane and dignified manner. I further understand that although most deaths occur within 3 hours, my death may take longer, and my attending physician or attending APRN has counseled me about this possibility.

I make this request voluntarily, without reservation, free from coercion or pressure, and I accept full responsibility for my actions.

Signed:_____
Dated: _____
_____Witness, Date
_____Witness, Date

4

> (1) A relative of the individual by blood, marriage, or adoption.
> (2) Entitled to any portion of the estate of the individual upon the individual's death under a will or by operation of law at the time the request for medication is signed.
> (3) An owner, operator, or employee of a health-care institution where the individual is receiving medical treatment or is a resident.

16 Del. C. § 2505C(d).

Section 2508C sets forth the numerous responsibilities of the attending physician or APRN. Before the attending physician prescribes medication, they must, *inter alia*: provide medically acceptable care, § 2508C(1); determine if the individual has a terminal illness, decision-making capacity, and has voluntarily made the request, § 2508C(2); provide full disclosures to affirm the individual is making an informed decision, § 2508C(4); confirm that the individual is not acting under duress by discussing, "outside the presence of another individual, except for an interpreter as necessary," § 2508C(5); refer the individual to a consulting physician or APRN, § 2508C(6); inform the individual that they may rescind the request "at any time and in any manner," § 2508C(10).

Section 2509C sets forth the requirements of the consulting physician or APRN. Under this Section, the consulting physician or APRN must:

> (1) Evaluate the individual and the individual's relevant medical records.
>
> (2) Confirm, in writing, to the attending physician or attending APRN that the individual meets all of the following:
>   a. Has a terminal illness.
>   b. Has decision-making capacity or provide documentation that the consulting physician or consulting APRN has referred the individual for further evaluation under § 2510C of this title.
>   c. Is making an informed decision.
>   d. Is acting voluntarily.

16 Del. C. § 2509C. If the individual's "attending physician, attending APRN, consulting physician, or consulting APRN believes that an individual may not have decision-making capacity, the physician or APRN shall refer the individual to a psychiatrist or psychologist for evaluation of the individual's decision-making capacity." 16 Del. C. § 2510C(a). If that "psychiatrist or psychologist finds that the individual does not have decision-making capacity," then the individual is no longer considered a qualified individual. 16 Del. C. § 2510C(c).

B. **Procedural History**

Plaintiffs - one individual with a spinal cord injury, and six organizations - brought this action seeking to enjoin implementation and enforcement of Delaware's EOLOA. D.I. 1.

Plaintiff Mr. Curran is a Delaware citizen who suffered a severe spinal cord injury as a teenager that left him as a quadriplegic. D.I. 1 ¶ 18. He has worked for 27 years at J.P. Morgan Chase in Newark. D.I. 1 ¶ 19.

Plaintiff Delaware Adapt is "a grass roots community-based membership organization based in Delaware, that provides services by and for people with disabilities, including people with life-threatening disabilities." D.I. 1 ¶ 22. Its "core business activity is to to assist its members and others to live outside of institutions such as nursing homes." D.I. 1 ¶ 25.

Plaintiff United Spinal is "a national 501(c)(3) nonprofit membership organization that was founded by paralyzed veterans in 1946." D.I. 1 ¶ 30. United Spinal's mission is "empowering and advocating for people living with spinal cord injuries and diseases ('SCI/D') and all wheelchair users, including veterans, to obtain greater independence and quality of life." *Id.*

Plaintiff NCIL "is the longest-running national, cross disability, grassroots organization run by and for people with disabilities." D.I. 1 ¶ 37. NCIL "works to advance independent living and the rights of people with disabilities," and its "membership comprises centers for independent living ('CILs'), state independent living councils ('SILCs'), people with disabilities, and other

disability rights organizations." *Id.* There are two CILs in Delaware. D.I. 1 ¶ 38. One of these CILs is Plaintiff FCIL, "a 501(c)(3) non-profit based in Middletown, Delaware, that provides services by and for people with disabilities." D.I. 1 ¶ 26. FCIL's mission is "to help people who live with significant disabilities, including life-threatening disabilities, to be independent in the community." *Id.*

Plaintiff "NDY is a national disability rights organization formed in 1996 to articulate and organize the disability rights opposition to the legalization of assisted suicide, to oppose public policies that allow the involuntary withholding of life-sustaining medical treatment, and to advocate for equal protection of the law in cases of homicides of persons with disabilities." D.I. 1 ¶ 43. NDY's "core activity is to advance the rights of people with disabilities to live free from pressure from a medical care system grounded in the misconception that people with disabilities are leading lives that are not worth living." D.I. 1 ¶ 45.

Plaintiff IPR "is a national, 501(c)(3) organization that conducts and supports research and public education on healthcare disparities in the context of end-of-life issues." D.I. 1 ¶ 47. IPR "advocates to protect individuals' rights in numerous healthcare contexts . . . ." *Id.*

Defendants comprise the Governor of Delaware, Departments of the Delaware state government, other government officials and professionals tasked with implementing and enforcing Delaware's EOLOA. D.I. 1. DHSS is tasked with a series of responsibilities under Delaware's EOLOA and is the recipient of federal funds. D.I. 1 ¶ 53. The DBMLD is a governmental agency that establishes and regulates the licensing standards for certain medical professionals in Delaware (e.g., physicians). D.I. 1 ¶ 55. The DBN is a governmental agency regulating the licensure and discipline of APRNs. D.I. 1 ¶ 58. Governor Meyer, Secretary Young, Dr. Parise, and APRN Mainwaring are named in their official capacities as the Governor of Delaware, the Secretary of

DHSS, President of the DBMLD, and President of the DBN, respectively. D.I. 1 ¶¶ 50, 54, 57, 59.

## II.    LEGAL STANDARDS

### A.    <u>Temporary Restraining Order</u>

Federal Rule of Civil Procedure 65 governs the issuance of temporary restraining orders. "Like a preliminary injunction, a temporary restraining order is an 'extraordinary and drastic remedy . . . that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Sun v. Bloomberg, L.P.*, No. 25-1007, 2025 WL 2697164, at *1 (D. Del. Sept. 22, 2025) (emphasis in original) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

"The standard for analyzing a motion for a temporary restraining order is the same as that for a motion seeking a preliminary injunction." *Cooper v. Crowl*, No. 25-139-GBW, 2025 WL 753868, at *2 (D. Del. Mar. 10, 2025) (quoting *Mehul v. Smith*, No. 20-1173, 2022 WL 481785, at *2 (M.D. Pa. Feb. 16, 2022)). "Accordingly, a temporary restraining order is warranted if the moving party shows '(1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of the restraining order it seeks, (3) the balance of the equities tips in its favor, and (4) a [restraining order] is in the public interest.'" *Id.* (quoting *Genetech, Inc. v. Immunex R.I. Corp.*, 395 F. Supp. 3d 357, 366 (D. Del. 2019)). "Importantly, the movant must demonstrate the presence of the first element, a likelihood of success on the merits." *Id.* "A movant's failure to establish a likelihood of success on the merits 'necessarily' results in the denial of the motion for a temporary restraining order." *Id.* (quoting *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012)).

### B.    <u>Article III Standing</u>

"Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 378

(2024). To establish Article III standing, "a plaintiff must demonstrate (i) that [he or she] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Id.* at 380 (citing *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381; *see also id.* at 382 ("An Article III court is not a legislative assembly, a town square, or a faculty lounge. Article III does not contemplate a system where 330 million citizens can come to federal court whenever they believe that the government is acting contrary to the Constitution or other federal law.").

"Injury in fact is the 'foremost' of standing's three elements.'" *Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 885 (3d Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, *as revised* (May 24, 2016)). To satisfy this element, a plaintiff must show "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (citing *Lujan*, 504 U.S. at 560). Such an injury must affect the plaintiff in a "personal and individual way." *Lujan*, 504 U.S. at 560 n.1.

**C.    Article III Organizational Standing**

"An organization may establish Article III standing in two ways." *NAACP Del. v. City of Wilmington*, No. 23-1205-GBW, 2025 WL 1927620, at *6 n.6 (D. Del. July 14, 2025). *First*, "organizations may have standing 'to sue on their own behalf for injuries they have sustained.'" *Alliance*, 602 U.S. at 393 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). "In doing so, however, organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Id.* at 393-94 (citing *Havens*, 455 U.S. at 379)). Organizational standing cannot be based simply "on the intensity of the litigant's interest

9

or because of strong opposition to the government's conduct, no matter how longstanding the interest and no matter how qualified the organization . . . ." *Id.* at 394 (cleaned up). Moreover, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.*

*Second,* an organization has associational standing if it can demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343 (1977).

### D.    Claims under the ADA, Rehabilitation Act, and ACA

Title II of the Americans with Disabilities Act provides that, "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C § 12132.

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

"Except for causation, the substantive standards for determining liability under Section 504 [of the Rehabilitation Act] and Title II [of the Americans with Disabilities Act] are identical, and the same remedies are available under both Acts." *Montanez v. Price,* 154 F.4th 127, 146 (3d Cir. 2025) (citing *Blunt v. Lower Merion Sch. Dist.,* 767 F.3d 247, 275 (3d Cir. 2014); 29 U.S.C. § 794a; 42 U.S.C. § 12133)). "To state a claim for disability-based discrimination, a plaintiff must

show that: (1) he is a qualified individual; (2) with a disability; (3) who was excluded from participation in or denied the benefits of the services, programs, or other activities for which a public entity is responsible, or was otherwise subjected to discrimination by a public entity; (4) by reason of his disability." *Id.* (citing *Haberle v. Troxell*, 885 F.3d 170, 178 (3d Cir. 2018)).

Section 1557 of the Affordable Care Act provides that, "[e]xcept as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under . . . [29 U.S.C. § 794], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance . . . ." 42 U.S.C. § 18116. "For disability-discrimination claims, the [Affordable Care Act] incorporates the substantive analytical framework of the [Rehabilitation Act]." *Brown v. United States*, No. 21-829, 2023 WL 2428838, at *4 (D. Del. Mar. 9, 2023) (alterations in original) (quoting *Francois v. Our Lady of the Lake Hospital, Inc.*, 8 F.4th 370, 378 (5th Cir. 2021)); *see also Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926 F.3d 235, 239 (6th Cir. 2019) (same).

## III.    DISCUSSION

The Court will divide its discussion of Plaintiffs' TRO Motion into two sections. First, the Court will discuss whether Plaintiffs have standing to challenge Delaware's EOLOA. Second, the Court will address the merits of Plaintiffs' claims.

### A.    <u>Standing</u>

As discussed below, the Complaint fails to sufficiently allege that either Mr. Curran or Organizational Plaintiffs have standing under Article III of the U.S. Constitution as a matter of law.

11

<u>Mr. Curran Lacks Standing</u>

The Complaint fails to sufficiently allege that Mr. Curran has standing as a matter of law because the Complaint does not sufficiently allege that Mr. Curran satisfies the eligibility requirements of the Act. As described above, only an individual with a "terminal illness" may request and administer life-ending medication under Delaware's EOLOA, and the Act defines "terminal illness" as "an incurable and irreversible disease, illness, or condition that as a medical probability, will result in death within 6 months." 16 Del. C. § 2502C(17).

In the Complaint, the only condition of Mr. Curran that Plaintiffs allege is quadriplegia. D.I. 1 ¶ 154. While the Court is sympathetic to Mr. Curran's condition, that Mr. Curran is quadriplegic does not, without more, plausibly constitute the required "medical probability" of "death within 6 months" as a matter of law. *See* 16 Del. C. § 2502C(17). In fact, Plaintiffs acknowledge that Mr. Curran has "lived a full life" since becoming quadriplegic 36 years ago. D.I. 1 ¶ 19.

Plaintiffs contend that Mr. Curran is able to continue living, despite being quadriplegic, only in light of medical intervention and that, absent such intervention, Mr. Curran's condition would result in death within six months. D.I. 50 at 5. However, Delaware's EOLOA does not broadly confer eligibility to anyone with a condition that would, as a medical probability, die within six months *without medical intervention*. Under Plaintiffs' expansive interpretation of Delaware's EOLOA, absurd results would arise, such as rendering eligible for assisted suicide those with medical ailments that can live long and vigorous lives with regular medical assistance, like type I diabetics that require regular insulin injections. *See In re Search Warrant No. 16-960-M-01*, 232 F. Supp. 3d 708, 723 (E.D. Pa. 2017) (explaining that "courts should avoid an

interpretation of a statute that produces odd or absurd results, or that is inconsistent with common sense" (citing *Disabled in Action of Pa. v. Southeastern Pa. Trans. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008))).

Since the Complaint does not otherwise specify a condition for Mr. Curran that would, as a medical probability, result in Mr. Curran's death within six months, the Complaint fails to sufficiently allege that Mr. Curran has an injury in fact as a matter of law. The Complaint also fails to sufficiently allege any injury that is traceable to Defendants' complained of conduct as a matter of law. For all of these reasons, the Complaint fails to sufficiently allege that Mr. Curran has Article III standing.

<u>Organizational Plaintiffs Lack Organizational Standing</u>

The Complaint fails to sufficiently allege that Organizational Plaintiffs have organizational standing as a matter of law.

*First*, at least some Organizational Plaintiffs allege "deep concerns regarding the impact of the Act" (*see, e.g.*, D.I. 1 ¶ 159) or otherwise abstractly oppose the Act (*see, e.g.*, D.I. 1 ¶ 24). However, such concerns and abstract opposition are insufficient to confer standing. *See Havens*, 455 U.S. at 379 (holding that the organizational plaintiffs were required to show "far more than simply a setback to [their] abstract social interests").

*Second*, at least some Organizational Plaintiffs claim that they are expending resources to oppose Delaware's EOLOA (*see, e.g.*, D.I. 1 ¶ 29). Such expenditures, however, are insufficient to confer standing. *See Alliance*, 602 U.S. at 394 (holding that plaintiffs cannot manufacture standing "simply by expending money to gather information and advocate against" Defendants' actions).

*Third*, Organizational Plaintiffs allege some purported and minimal harm to their "core business activities," such as now having to spend time "to ease the anxiety and fears regarding members' end of life decisions." D.I. 50 at 6 & n.4 (citations omitted). Such alleged impairment, however, does not confer standing in this action under the present circumstances as a matter of law.

In *Alliance*, doctor plaintiffs claimed, in response to a regulation allowing the prescription of mifepristone, "various monetary and related injuries that they allegedly [would] suffer as a result of FDA's actions—in particular, diverting resources and time from other patients to treat patients with mifepristone complications; increasing risk of liability suits from treating those patients; and potentially increasing insurance costs." 602 U.S. at 390. The U.S. Supreme Court held that the "causal link between FDA's regulatory actions and those alleged injuries [was] too speculative or otherwise too attenuated to establish standing." *Id.* Similar to the *Alliance* plaintiffs, Organizational Plaintiffs in this action allege "various monetary and related injuries that they allegedly will suffer as a result of [Delaware's EOLOA]," including the diversion of "resources and time from" core business activities. *See id.* As in *Alliance*, the "causal link between [Delaware's EOLOA] and those alleged injuries is too speculative or otherwise too attenuated to establish standing." *See id.*

Indeed, as Defendants correctly observe, Organizational "Plaintiffs remain unencumbered in their advocacy initiatives, both for the wellbeing of people with disabilities, and for opposing laws that may allow terminally ill persons to receive end-of-life treatment options." *See* D.I. 37 at 12. Without any plausible allegations of actual injury, "Organizational Plaintiffs' complaints amount to nothing more than a legal objection to the law, fueled by their strong moral, ideological,

and policy beliefs," which does not satisfy the injury requirement. *See* D.I. 37 at 12-13. For all these reasons, Organizational Plaintiffs lack organizational standing in this action.

<u>Organizational Plaintiffs Lack Associational Standing</u>

As described above, associational standing requires that at least one of the organization's "members would otherwise have standing to sue in their own right." *Hunt*, 432 U.S. at 343. In this action, Plaintiffs allege that "each Organizational Plaintiff has non-party constituent members who could be deemed to have a 'terminal illness' and would qualify for assisted suicide under [Delaware's] EOLOA." D.I. 50 at 8 (citations omitted). Plaintiffs' contention, however, lacks adequate support in the Complaint as a matter of law.

To begin, the Complaint does not sufficiently allege that Mr. Curran has standing for the reasons set forth above. Moreover, the Complaint does not sufficiently allege standing for any other member of the Organizational Plaintiffs. The only specific person that Plaintiffs identify, other than Mr. Curran, is Delaware ADAPT's Organizer, Daniese McMullin-Powell ("Ms. McMullin-Powell"). *See* D.I. 50 at 8 (citations omitted), D.I. 1. In particular, the Complaint alleges that Ms. McMullin-Powell is "a polio survivor" that "has not been able to walk unassisted since she was three-years old, and she has been a wheelchair user since her early 20s." D.I. 1 ¶ 155, *see also* D.I. 1 ¶¶ 156-58. The Complaint also alleges that Ms. McMullin-Powell "is currently 79 years old and struggles with chronic pain." D.I. 1 ¶ 155. However, such ailments do not plausibly constitute a condition with a medical probability of death within six months. Without eligibility under the Act, the Complaint fails to sufficiently allege that Ms. McMullin-Powell has injury in fact and, therefore, Ms. McMullin-Powell is not a member that can satisfy the first element of associational standing. *See Nationwide Ins. Indep. Contractors Ass'n v. Nationwide Mut. Ins. Co.*, No. 11-3085, 2012 U.S. Dist. LEXIS 60691, at *6-7 (E.D. Pa. Apr. 30, 2012)

("Without an allegation that a specific member of the association has standing, the case must be dismissed for lack of associational standing." (citing *Pa. Prison Soc'y v. Cortes*, 622 F.3d 215, 228 (3d Cir. 2010))).

Without sufficiently making allegations of any members that can plausibly satisfy the first element of associational standing, Organizational Plaintiffs have failed to sufficiently allege associational standing. Thus, given that Mr. Curran and Organizational Plaintiffs have failed to sufficiently allege standing, this action must be dismissed for lack of standing which deprives the Court of jurisdiction.

**B.    Plaintiffs' TRO Motion on the Merits**

Although the Court has determined that Plaintiffs lack standing, the Court will evaluate Plaintiffs' TRO Motion on the merits. The Court will discuss each individual claim included in the Complaint in turn.

      1.     Count I (Americans with Disabilities Act, 42 U.S.C. §§ 12132, 12203), Count II (Rehabilitation Act, 29 U.S.C. § 794), and Count III (Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116)

As Plaintiffs recognize, the pleading standards for their statutory claims under the ADA, Rehabilitation Act, and Affordable Care Act all follow a similar analysis. *See* D.I. 4 at 9 (conceding that claims under the ADA, Rehabilitation Act, and Affordable Care Act use the "same analysis"); *see also* D.I. 37 at 15 ("The pleading requirements under the Rehabilitation Act and the Affordable Care Act are virtually identical to those for claims under the ADA." (citing *Jones v. CVS Pharmacy, Inc.*, No. 21-157, 2022 WL 4536124, at *5 n.2 (M.D. Pa. Sept. 28, 2022)).

Through their motion, Plaintiffs claim that Delaware's "EOLOA undermines the assumptions, concepts, values, and practices of Delaware's suicide prevention scheme, and replaces it with an alternative and inherently discriminatory scheme where persons with a 'terminal illness' under [Delaware's] EOLOA can be steered toward assisted suicide." D.I. 4 at 11.

According to Plaintiffs, Delaware's EOLOA implicates the ADA because certain individuals, such as Plaintiff Curran, have disabilities under the ADA that would also "satisfy the definition of 'terminal illness' under [Delaware's] EOLOA." D.I. 1 ¶ 169. Plaintiffs claim that exclusion of people with such disabilities from participation in Delaware's suicide prevention services constitutes "discrimination based on disability in violation of 42 U.S.C. § 12132." D.I. 1 ¶ 170. Moreover, the fact that Delaware's EOLOA only allows people with terminal illnesses (which could also qualify as disabilities under the ADA) is, according to Plaintiffs, "facially discriminatory." D.I. 50 at 10. Plaintiffs allege similar discriminatory conduct as violating the Rehabilitation Act and the Affordable Care Act.

The problem for Plaintiffs, however, is that the assisted suicide contemplated by Delaware's EOLOA is entirely voluntary. *See* D.I. 37 at 15. Plaintiffs fail to provide, nor could the Court identify, a case where discrimination under the ADA (or Rehabilitation Act or ACA) was found by virtue of a person with disabilities being granted *more* options than their non-disabled counterparts. Contrary to Plaintiffs' suggestion, nothing in Delaware's EOLOA could reasonably be read to deny people with disabilities under the ADA with access to suicide prevention services. *See id.* at 15-17; *see also* 16 Del. C. § 2501C, *et seq.*

The court in *United Spinal Association v. California*, No. 23-03107, 2024 WL 1671167 (C.D. Cal. Mar. 27, 2024) ("*United Spinal I*") faced a similar situation. The plaintiffs in *United Spinal I* brought an "action challenging the validity and constitutionality of the [California] EOLOA." 2024 WL 1671167, at *2. Two of the claims brought by the plaintiffs in *United Spinal I* were that the California EOLOA violated both the ADA and Rehabilitation Act. *Id.* at *5. The court in *United Spinal I* rejected both claims, finding that:

> The [California] EOLOA does not preclude, prohibit, or otherwise
> bar disabled individuals from availing themselves of the benefits of

17

> any behavioral health services and suicide prevention programs, nor does it contain any provisions encouraging or steering patients toward physician-assisted suicide. The statute provides an entirely optional alternative for terminally ill patients when deciding how to manage their diagnoses, and contains a number of safeguards designed to ensure that a requesting patient's decision is voluntary and intentional.

*Id.* at *6. The court in *United Spinal I* concluded that such circumstances cannot amount to discrimination under either act, holding that discrimination only "occurs when an individual is excluded from participation in or denied the benefits of a service - not when he or she chooses not to participate in or receive the benefits of the service." *Id.* (internal citation omitted). This Court agrees with the court in *United Spinal I* and finds that Delaware's EOLOA does not amount to discrimination or otherwise violate the ADA, Rehabilitation Act, or Affordable Care Act. Similar to California's EOLOA, Delaware's EOLOA does not deny people with disabilities the right to suicide prevention services. Nor does Delaware's EOLOA contain any provisions encouraging or steering patients toward physician assisted suicide. Rather, Delaware's EOLOA provides an entirely optional alternative for terminally ill patients when deciding how to manage their diagnoses by providing them with an opportunity to request prescribed medication for a peaceful, self-administered death, under limited circumstances and after feasible alternatives have been discussed, rather than suffering needlessly from incurable conditions with six months or less to live. D.I. 37 at 17 (citing 16 Del. C. § 2508C(10)). Delaware's EOLOA includes multiple safeguards to ensure people with terminal illnesses who request end of life medication understand the consequences of their request *and the potential alternatives. See, e.g.,* 16 Del. C. § 2502C(7) (defining decision-making capacity to include the ability to understand and appreciate "alternatives to any proposed health care"); *id.* at § 2502C(10)(e) (providing that an informed decision must include the attending physician or APRN informing the patient of "[t]he feasible alternative,

18

concurrent, or additional treatment opportunities, including comfort care, hospice care, and pain control"); *id.* at § 2503C(b) (requiring that an attending physician or APRN provide "sufficient information . . . regarding all available treatment options, and the alternatives and the foreseeable risks and benefits of each"); *id.* at § 2505C(f) (requiring that a written request (which is required to receive end of life medication under Delaware's EOLOA) include a statement that the patient has been fully informed of alternative, concurrent, or additional treatment opportunities available, and that the request is made voluntarily and free from coercion or pressure); *id.* at § 2507C(a)-(b) (requiring that an attending physician or APRN wait at least 15 days from a patient's first oral request and 48 hours from a patient's written request for end of life medication to prescribe said medication); *id.* at § 2508C(4)(e) (requiring that an attending physician or APRN inform a patient requesting end of life medication of "feasible alternative, concurrent, or additional treatment opportunities" before end of life medication is prescribed). Thus, the Court finds that Plaintiffs are not likely to succeed on their claims under the ADA, Rehabilitation Act, and/or Affordable Care Act. Accordingly, Plaintiffs' request for a TRO under counts 1-3 of the Complaint is also denied on the merits.

> 2. Count IV (Equal Protection Clause) and Count V (Fourteenth Amendment Due Process Clause, and Article I, Section 7 of the Delaware State Constitution)

In their TRO Motion, Plaintiffs claim that Delaware's EOLOA violates their rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the U.S. Constitution, as well as the Due Process Clause of the Delaware State Constitution. D.I. 4 at 12-18. The following subsections analyze Plaintiffs' contentions under all of these constitutional provisions. As discussed below, Plaintiffs are unlikely to succeed on the merits as to each of these provisions. Thus, the Court also denies Plaintiffs' requests for a TRO under counts 4 and 5 of the Complaint on the merits.

a.    <u>**Substantive Due Process under the Fourteenth Amendment**</u>

Under the Due Process Clause of the U.S. Constitution, no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.  In substantive due process analysis, the "first task is to determine the level of scrutiny to apply." *LoPresti v. Johnson*, No. 22-1435, 2023 WL 6890732, at *4 (3d Cir. Oct. 19, 2023).  Courts "apply rational basis review in substantive due process challenges unless the challenged statute 'abridges certain fundamental rights and liberty interests.'" *Id.* (quoting *Heffner v. Murphy*, 745 F.3d 56, 79 (3d Cir. 2014)).  Conversely, "[w]hen a statute abridges fundamental rights and liberty interests, [courts] apply strict scrutiny." *Id.* (citation omitted); *see also Children's Health Def., Inc. v. Rutgers, the State Univ. of New Jersey*, 93 F.4th 66, 78 (3d Cir.), *cert. denied sub nom. Children's Health Def. v. Rutgers, the State Univ. of New Jersey*, 144 S. Ct. 2688 (2024) ("In reviewing such claims, [courts] apply rational basis review unless there has been a violation of a fundamental right." (citing *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022))).

"A 'fundamental right' must be either enumerated in the Bill of Rights or 'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty.'" *Children's Health*, 93 F.4th at 78 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)).  The Supreme Court "has required a 'careful description' of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 703 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)).  This desire for a careful description flows from "[t]he doctrine of judicial self-restraint" that requires a court "to exercise the utmost care whenever [it is] asked to break new ground in this field." *Reno*, 507 U.S. at 302 (first alteration in original) (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992)); *see also Collins*, 503 U.S. at 125 (recognizing that the "guideposts for responsible decision[-]making in this unchartered area [of substantive due process] are scarce and open-ended"); *LoPresti*, 2023 WL 6890732, at *4 ("Determining the level of scrutiny requires us to

identify the alleged due process right at issue *carefully and precisely*.") (emphasis added) (cleaned up).

For example, in *Glucksberg*, the Supreme Court analyzed a Washington statute that prohibited aiding another person to commit suicide. *Glucksberg*, 521 U.S. at 723. In *Glucksberg*, the respondents had broadly asserted a protected interest in their "liberty to choose how to die" or the "liberty to shape death." *Id.* The Supreme Court rejected this proposed analysis, reasoning that the correct inquiry was "whether the 'liberty' specially protected by the [Due Process] Clause includes a right to commit suicide which itself includes a right to assistance in doing so." *Id.*

According to Plaintiffs, Delaware's EOLOA implicates a "fundamental right"; specifically, "the right to live." D.I. 4 at 12; *see also* D.I. 50 at 11 (referencing a "right to life"). Plaintiffs' broad framing of the asserted liberty interest harkens to that of the respondents in *Glucksberg*. *See Glucksberg*, 521 U.S. at 723. The proper inquiry is whether the protections afforded by the Due Process Clause of the Fourteenth Amendment include the right for informed, uncoerced individuals, living with terminal illness and a prognosis of less than six months to live, to be free from living within a jurisdiction that permits them - but does not require them - to request medicine that will end their life from a licensed medical professional. *See id.* The Court concludes that it does not.

Almost three decades ago, the Supreme Court recognized that "[t]hroughout the Nation, Americans are engaged in an earnest and profound debate about the morality, legality, and practicality of physician-assisted suicide." *Glucksberg*, 521 U.S. at 735; *see also id.* ("Our holding permits this debate to continue, as it should in a democratic society."). As the Third Circuit recently observed, this debate continues today.

> Doctor-assisted suicide is no ordinary policy choice. It asks legislatures to weigh life against death. On one side stand some

> terminally ill patients who understandably want to control and limit
> their suffering. On the other side stand the preciousness of life,
> efforts to shield the vulnerable from undue influence and their
> doctors from prosecution or liability, and the need to preserve
> harmony among the states. Legislatures do not make that choice
> lightly. A state may legitimately worry about safeguarding the sick
> and depressed from feeling pressure to die too soon.

*Bryman v. Murphy*, No. 24-2947, 2025 WL 3493889, at *1 (3d Cir. Dec. 5, 2025).

In passing its EOLOA, Delaware joined the growing minority of states that allow individuals to avail themselves of medically-assisted suicide. *See id.* at *6 (canvassing state laws). Though "[t]here is no longstanding tradition of doctor-assisted suicide," *see id.* at *3, Delaware's EOLOA does not require any individuals to make the request, and offers them numerous opportunities to rescind it. *See* 16 Del. C. § 2506C(a) (individuals may rescind request "[a]t any time"), § 2506C(b) (no attending physician or APRN may write a prescription without first providing the individual "an opportunity to rescind the request"). Simply because the right to medically-assisted suicide is not a fundamental right, it is not necessarily the case that the freedom from living in a jurisdiction permitting, but not requiring, medically assisted suicide is a right that is either "deeply rooted in this Nation's history and tradition," or "implicit in the concept of ordered liberty." *Children's Health*, 93 F.4th at 78 (quoting *Glucksberg*, 521 U.S. at 720-21 (1997)). Nor have Plaintiffs cited any such historical tradition. In sum, the Fourteenth Amendment's Due Process Clause does not include a right for informed, uncoerced individuals living with terminal illness and a prognosis of six months or less to live to be free from living within a jurisdiction that *permits* them - but does not require them - to commit suicide with the aid of a medical professional.

Because Delaware's EOLOA does not implicate a fundamental right, the Act is subject to a rational basis review. Delaware EOLOA's stated interests include Delaware's desire that a terminally ill individual should be permitted to "end their life in a humane and dignified manner,"

16 Del. C. § 2501C(a), where that individual is not "coerced, pressured, or otherwise compelled to take medication to end their life," and their decision is "made voluntarily by a terminally-ill-adult individual with decision-making capacity," not by any surrogate, § 2501C(b). Furthermore, Delaware EOLOA's stated interests include that no health care provider should be subject to civil or criminal liability if they comply with an individual's request, if in compliance with the EOLOA, § 2501C(c); and that the individual's decision should not "impact life insurance or annuity policies," § 2501C(d). As Defendants note (D.I. 37 at 19), the Third Circuit recently found similar interests to be legitimate governmental interests while reviewing New Jersey's physician assisted suicide law. *Bryman*, 2025 WL 3493889, at *5 ("Shielding doctors from liability, preventing interstate friction, protecting patients from insurers' pressure, and preventing rash decisions made in agony or depression are all legitimate governmental interests, and the Act rationally furthers them."). Therefore, this Court finds that Delaware EOLOA's stated interests are all legitimate governmental interests that pass rational basis review. Thus, Plaintiffs' substantive due process claims under the Fourteenth Amendment fail.

### b.    Procedural Due Process under the Fourteenth Amendment

"A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023) (citing *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)); *see also Burns v. PA Dep't of Correction*, 544 F.3d 279, 285 (3d Cir. 2008) ("To prevail on a procedural due process claim, a litigant must show (1) that the state deprived him of a protected interest in life, liberty, or property and (2) that the deprivation occurred without due process of law.") (citation omitted). "Due process usually requires at least 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *R.B. v. Westmoreland Cnty.*, 526 F. App'x 181, 185 (3d Cir. 2013) (cleaned up) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

Plaintiffs contend that Delaware's EOLOA violates "the private interest" of "the life of disabled individuals who qualify as having a 'terminal illness' under [Delaware's EOLOA]." D.I. 4 at 17. Specifically, Plaintiffs claim that the procedures set forth in Delaware's EOLOA create a "high risk of erroneous depravation" because the EOLOA does not mandate mental health evaluations and permits APRNs to certify patients as having a terminal illness. *Id.*

Fatal to Plaintiffs' procedural due process claim, however, is the voluntary nature of Delaware's EOLOA. *See Reed*, 598 U.S. at 236 (requiring "deprivation *by state action*") (emphasis added); *see also Moran v. S. Reg'l High Sch. Dist. Bd. of Educ.*, No. 05-1062 (SRC), 2006 WL 932339, at *7 (D.N.J. Apr. 11, 2006) (school official was not denied procedural due process because he signed a resignation agreement and "could have simply declined to enter into an [a]greement to voluntarily resign his position"); *Judge v. Shikellamy Sch. Dist.*, 905 F.3d 122, 126 (3d Cir. 2018) (school principal's "presumptively voluntary" decision to leave post foreclosed her "procedural due process theories"). Thus, Plaintiffs' procedural due process claims under the Fourteenth Amendment fail.

### 3. Equal Protection Clause

Under the Equal Protection Clause of the Constitution, no state may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Under the Equal Protection Clause, "[a]t a minimum, intentional discrimination against any 'identifiable group' is subject to rational-basis review, which requires the classification to be rationally related to a legitimate governmental purpose." *Hassan v. City of New York*, 804 F.3d 277, 298 (3d Cir. 2015), *as amended* (Feb. 2, 2016) (quoting *Johnson v. Cohen*, 836 F.2d 798, 805 n.9 (3d Cir. 1987)); *see also United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938) (noting that some classifications may call for a "more searching judicial inquiry"). "Where a 'quasi-suspect' or 'suspect' classification is at issue, however, the challenged action must survive 'intermediate

24

scrutiny' or 'strict scrutiny.'" *Hassan*, 804 F.3d at 298. "Intermediate scrutiny (applicable to quasi-suspect classes like gender and illegitimacy) requires that a classification 'be substantially related to an important governmental objective.'" *Id.* at 298-99 (quoting *Clark v. Jeter*, 486 U.S. 456, 461 (1988)). "[S]trict scrutiny (applicable to suspect classes like race and nationality) is an even more demanding standard, which requires the classification be 'narrowly tailored to further a compelling governmental interest.'" *Id.* at 299 (cleaned up) (quoting *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003)). Strict and intermediate scrutiny - together, "heightened scrutiny" - "set up a presumption of invalidity that [Plaintiffs] must rebut." *Id.*

As discussed above, Delaware's EOLOA does not implicate a fundamental right. Nor does it involve a classification based on a suspect or quasi-suspect class. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440-42 (1985) (listing the classifications subject to heightened scrutiny). Indeed, as Defendants note (D.I. 37 at 18), Plaintiffs point to no Supreme Court or Third Circuit cases supporting the proposition that individuals living with a terminal illness constitute a protected class. Therefore, Delaware's EOLOA is subject to rational basis review. As explained above, Delaware's EOLOA is "rationally related to a legitimate governmental purpose" and passes rational basis review. *See Hassan*, 804 F.3d at 298. Thus, Plaintiffs' claims under the Equal Protection Clause also fail.

### 4.   Article I, Section 7 of the Delaware State Constitution

"Article I, § 7 of the Delaware Constitution provides that an individual shall not be 'deprived of life, liberty, or property, unless by the judgment of his peers or by the law of the land.'" *Helman v. State*, 784 A.2d 1058, 1070 (Del. 2001). The Delaware Supreme Court has "previously determined that the due process clause of the Delaware Constitution has 'substantially the same meaning' as the due process clause contained in its federal counterpart." *Id.* (quoting *Opinion of the Justices*, 246 A.2d 90, 92 (Del. 1968)). "[I]n a variety of contexts, the Delaware

Supreme Court has understood Article I, § 7 as being 'similar,' 'co-extensive' or as having substantially the same meaning as the Federal Constitution's due process provisions.'" *See State v. Xenidis*, 212 A.3d 292, 302 & n.43 (Del. Super. Ct. 2019), *aff'd*, 226 A.3d 1137 (Del. 2020) (collecting cases).  Plaintiffs do not contend that the Delaware Constitution provides them protections beyond that of the United States Constitution that would be pertinent to resolution of their TRO Motion. *See* D.I. 4 at 15 (quoting *Blinder, Robinson & Co., Inc. v. Bruton*, 552 A.2d 466, 472 (Del. 1989) for the proposition that Article I, § 7's protections are "coextensive" with the federal Due Process Clause).  Thus, for the same reasons explained above in the Court's analysis addressing Plaintiffs' claims under the Due Process Clause of the U.S. Constitution, this Court finds that Plaintiffs' claims are unlikely to succeed on the merits under Article I, § 7 of the Delaware Constitution.

## IV.    CONCLUSION

For the above reasons, the Court finds that Plaintiffs lack standing and dismisses this action for lack of jurisdiction.  The Court also denies Plaintiffs' TRO Motion (D.I. 3) on the merits, and denies as moot the Motion to Intervene (D.I. 38).  An Order consistent with this Memorandum Opinion will be entered.